NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

Nos. 13-7063 and 13-7064

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

TONIA EDWARDS; BILL MAIN,
PLAINTIFFS-APPELLANTS,

v.

DISTRICT OF COLUMBIA,
DEFENDANT-APPELLEE.

———————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

BRIEF FOR APPELLEE DISTRICT OF COLUMBIA

———————————

IRVIN B. NATHAN
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

MARY L. WILSON
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-5693
mary.wilson@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The plaintiffs below and appellants here are Tonia Edwards and Bill Main.  The defendant below and appellee here is the District of Columbia.  The Cato Institute is an amicus curiae in support of plaintiffs-appellants on appeal.

B. *Rulings under review*.—In appeal No. 13-7063, the plaintiffs appeal from the district court's order docketed February 25, 2011, denying their motion for a preliminary injunction.  *Edwards v. District of Columbia*, 765 F. Supp. 2d 3 (D.D.C. 2011).  In consolidated appeal No. 13-7064, the plaintiffs appeal from the district court's order docketed March 28, 2013, granting summary judgment to the District of Columbia.  *Edwards v. District of Columbia*, ___ F. Supp. 2d ___, 2013 WL 1881547 (D.D.C. 2013).

C. *Related cases*.—This case has not been before this Court or any other court, except the district court below.  Undersigned counsel is not aware of any related cases.

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES ..............................................................1

STATEMENT OF THE CASE...................................................................2

STATEMENT OF FACTS .........................................................................4

      1.    The District's Tour Guide Licensing Scheme. .....................................4

           A.   The history of tour guide licensing in the District.....................4

           B.   The current statute.......................................................5

           C.   The regulations............................................................6

           D.   The tour guide professional licensing exam. ............................8

           E.   The similarity of the District's licensing scheme to those of other cities and the federal government.................................8

      2.    The Facts Specific To The Plaintiffs' Claim. .....................................10

      3.    Proceedings Below And The District Court's Decision.....................13

STANDARD OF REVIEW ......................................................................15

SUMMARY OF ARGUMENT.................................................................16

ARGUMENT ...........................................................................................20

      I.    As The District Court Held, Intermediate Scrutiny Rather Than Strict Scrutiny Applies To The District Of Columbia's Regulations Of The Tour Guide Profession. ......................................20

           A.   Strict scrutiny would be inconsistent with the longstanding acceptance of licensing requirements for occupations when needed to protect the public, even where a substantial portion of the occupation at issue involves speech. ........................................................20

B.   Intermediate scrutiny applies because the statute and regulations at issue here are content neutral, especially considering that the parties agree that they are simply an attempt to define the profession at issue. ...................................25

C.   The case law that the plaintiffs and amicus cite as requiring strict scrutiny is distinguishable. ...............................36

II.   The District Court Properly Held, Based On The Record, That The Overall Licensing Requirement Satisfies Intermediate Scrutiny. ..............................................................................................42

A.   The overall licensing requirement satisfies intermediate scrutiny. ....................................................................................42

B.   The court had ample justification for its holding......................43

CONCLUSION .......................................................................................................48

# TABLE OF AUTHORITIES*

*Cases*

*\*Am. Library Ass'n v. Reno*, 33 F.3d 78 (D.C. Cir. 1994) ................................. 25, 30

*Argello v. City of Lincoln*, 143 F.3d 1152 (8th Cir. 1998) ........................................ 39

*Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010) . 25, 26, 27, 28, 43

*Boos v. Barry*, 485 U.S. 312 (1988) ................................................................. 29, 32

*C.F. Commc'ns Corp. v. FCC*, 128 F.3d 735 (D.C. Cir. 1997) ................................ 33

*Calhoun v. Johnson*, 632 F.3d 1259 (D.C. Cir. 2011) .............................................. 15

*Christian Legal Soc'y Chapter v. Martinez*, 130 S. Ct. 2971 (2010) ...................... 40

*City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) ........................ 44, 45

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) .................................................... 34

*Dent v. West Virginia*, 129 U.S. 114 (1889) ........................................................... 21

*District of Columbia v. John R. Thompson*, 346 U.S. 100 (1953) ........................... 21

*Edwards v. District of Columbia*, ___ F. Supp. 2d ___, 2013 WL 1881547 (D.D.C.
    2013) ..................................................................................................................... i

*Edwards v. District of Columbia*, 765 F. Supp. 2d 3 (D.D.C. 2011) ........................ i

*Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4
    (D.C. Cir. 2008) ................................................................................................... 35

*Enten v. District of Columbia*, 675 F. Supp. 2d 42 (D.D.C. 2009) ......................... 24

---

\*     Authorities upon which we chiefly rely are marked with asterisks.

iv

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ............................... 22, 43, 47

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) ........................43

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ...............................................32

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ............................ 23, 30

*Graves v. Minnesota*, 272 U.S. 425 (1926) ...............................................................21

*Greater Tampa Chamber of Commerce v. Goldschmidt*,

   627 F.2d 258 (D.C. 1980) ......................................................................................33

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ..............................47

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .............. 40, 41, 43, 47, 48

*IDK, Inc. v. Clark Cnty.*, 836 F.2d 1185 (9th Cir. 1988) .........................................24

*Illusions-Dallas Private Club, Inc. v. Steen*, 482 F.3d 299 (5th Cir. 2007) ............30

*\*Kagan v. New Orleans*, ___ F. Supp. 2d ___, 2013 WL 3440154 (E.D. La. July 9,

   2013) ....................................................................... 24, 27, 30, 31, 36

*Kev, Inc. v. Kitsap Cnty.*, 793 F.2d 1053 (9th Cir. 1986) .......................................24

*Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011) ......................................................24

*\*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ...........................................43

*Lowe v. SEC*, 472 U.S. 181 (1985) ................................................................... 36, 37

*Maryland*, 380 U.S. 51 (1965) ..................................................................................31

*Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963)....21

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228

   F.3d 1043 (9th Cir. 2000) ........................................................................ 24, 29, 36

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009) ................................... 44

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) ..................................... 44, 45

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ............................. 21, 23, 25

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) ................................................ 44

*People v. Bowen*, 11 Misc. 2d 462 (N.Y. Spec. Sess. 1958) ...................... 22, 23, 47

*Police Dep't of Chi. v. Mosley*, 408 U.S. 92 (1972) ................................................ 20

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ............................... 26, 30, 31

*Richardson v. Davison*, 45 App. D.C. 395 (D.C. 1916) ........................................ 4, 5

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,

   547 U.S. 47 (2006) ............................................................................................ 29

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ....................................... 32

*Sorrell v. IMS Health Inc.*, 564 U.S. ___, 131 S. Ct. 2653 (2011) .................. 39, 40

*Thomas v. Collins*, 323 U.S. 516 (1945) ......................................................... 22, 38

*Time Warner Entm't Co., L.P. v. FCC*, 93 F.3d 957 (D.C. Cir. 1996) .............. 25, 44

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ............................. 20, 25, 26

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ........................................... 22

*United States v. O'Brien*, 391 U.S. 367 (1968) ................................................. 20, 42

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................... 26

*Watson v. Maryland*, 218 U.S. 173 (1910)...............................................................21

*Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ......................34

*Statutes*

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1331 ..........................................................................................................1

28 U.S.C. § 1343(a)(3).................................................................................................1

D.C. Code § 1-203.02 ................................................................................................21

D.C. Code § 47-2836 .................................................................................................13

D.C. Code § 47-2836(a).............................................................................5, 11, 26, 27

D.C. Code § 47-2846 ...................................................................................................6

D.C. Code § 47-2851.03d ..........................................................................................11

D.C. Code § 47-2851.01(4).........................................................................................6

D.C. Code § 47-2851.20 ..............................................................................................6

Charleston, S.C., Code of Ordinance §§ 29-1, 29-58 .................................................9

20 N.Y.C. Admin. Code § 242 ....................................................................................9

Phil. Code § 9-214 .....................................................................................................10

Savannah, Ga., Ordinance §§ 6-1502(a), 6-1514 .....................................................10

*Regulations*

36 C.F.R. § 25.2 ................................................................................................... 10, 46

36 C.F.R. § 25.2(b).....................................................................................................10

19 DCMR § 1200 *et seq.*............................................................................................6

19 DCMR § 1200.1 ............................................................................7, 28, 29, 32

19 DCMR § 1200.3 .................................................................................................6

19 DCMR § 1201.1 .................................................................................................6

19 DCMR § 1202.2 .................................................................................................6

19 DCMR § 1203.1 .................................................................................................7

19 DCMR § 1203.3 ............................................................................................7, 34

19 DCMR § 1204.3 ............................................................................................7, 32

19 DCMR § 1205 ....................................................................................................8

31 DCMR § 1000 ....................................................................................................7

31 DCMR § 1008.4 .................................................................................................7

# GLOSSARY

| | |
|---|---|
| JA | Joint Appendix |
| DCRA | Department of Consumer and Regulatory Affairs |
| RD | Record Document |
| SEC | Securities and Exchange Commission |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction of the plaintiffs' claim under 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has jurisdiction under 28 U.S.C. § 1291. In appeal No. 13-7063, the plaintiffs timely noted an appeal on March 25, 2011, from the February 25, 2011, order denying their motion for a preliminary injunction. Joint Appendix ("JA") 4-5. In appeal No. 13-7064, the plaintiffs timely noted an appeal on April 25, 2013, from the March 28, 2013, order granting summary judgment to the District of Columbia. JA 6.

## STATEMENT OF THE ISSUES

This case is about whether the District of Columbia's licensing scheme for tour guides who give tours in the District for a fee violates the First Amendment guarantee of free speech. The district court granted summary judgment to the District because the licensing scheme in no way restricts what tour guides may say. Rather, the licensing scheme was enacted to protect the safety of tour group participants and to reduce the chance they will be swindled or harassed by incompetents or charlatans. The issues on appeal are:

1. Does intermediate scrutiny rather than strict scrutiny apply to the District's tour guide licensing scheme because it is a routine occupational licensing requirement that is content neutral and in no way restricts what tour guides may say as they guide tourists around the District?

2. Was the district court's conclusion that the tour guide licensing requirements satisfy intermediate scrutiny justified by the record, history, consensus, and common sense, considering that (a) it is undisputed that millions of tourists come to the District every year and tourism is a vital part of the District's economy; (b) newspaper evidence dating back to when the law was first enacted a century ago reflects that tourists were being intimidated and harassed by unlicensed guides; (c) other cities with strong tourist trades also regulate tour guides to protect the health and welfare of visitors to their cities; and (d) the Supreme Court has recognized that occupational licensing furthers legitimate governmental interests?

## STATEMENT OF THE CASE

The plaintiffs are owners and operators of a tour guide company in the District of Columbia who challenged the District's tour guide licensing scheme as violative of their First Amendment right to free speech.  They sought declaratory and injunctive relief.

The district court denied the plaintiff's motion for a preliminary injunction, JA 73, and subsequently denied the plaintiffs' motion for summary judgment and granted summary judgment to the District, JA 184.  The court concluded that the tour guide licensing requirements are content neutral and pass intermediate scrutiny because they target the non-expressive conduct of guiding, directing, and

escorting a commercial sightseeing trip or tour, and only incidentally burden speech, if at all.  JA 193.  Requiring that guides who charge fees to lead tourists to different places of interest in the District have some basic knowledge about those sites does not relate to the suppression of speech, but "serves a basic consumer protection function by ensuring that persons selling their services—those of a knowledgeable and trustworthy guide—are at least minimally qualified to do so." JA 202-03.  The court concluded that the District's interest in keeping visitors from dangerous, unethical, or uninformed guides is not even remotely related to the suppression of free expression.  JA 203.  The minimal requirements for licensure, including passing a multiple-choice test about the District and its tourist attractions, satisfy intermediate scrutiny because they "ensure that prospective guides are who they say they are: persons with at least a minimal grasp of the history and geography of Washington, D.C."  JA 203.

In these consolidated appeals, the plaintiffs appeal from the orders denying a preliminary injunction and granting summary judgment to the District.  The plaintiffs concede, however, that the Court's judgment on the ultimate merits of the case will moot their request for a preliminary injunction and do not separately challenge the denial of the preliminary injunction.  Br. 1 n.2.

## STATEMENT OF FACTS

**1.    The District's Tour Guide Licensing Scheme.**

**A.    The history of tour guide licensing in the District.**

Occupational licenses have been required in the District of Columbia since 1902, when Congress imposed license-registration and fee requirements on a variety of businesses and professions, including apothecaries, auctioneers, cattle dealers, proprietors of passenger vehicles for hire, real estate agents, and owners of grounds used for entertainment such as horse racing, tournaments, and athletic sports. *Richardson v. Davison*, 45 App. D.C. 395, 399 (D.C. 1916) (describing Act of July 1, 1902, § 7, 32 Stat. 622, 623).

By 1927, there were reports that unlicensed self-styled "guides to Washington [had] been intimidating and annoying visitors," and had prompted a police drive against such guides. *Guides in Washington*, Wash. Post, Aug. 27, 1927, at 6. Thereafter, in 1928, the House Committee on the District of Columbia arranged for a study of the regulatory activities of the District, including revision of business licensing. *See* H.R. Doc. No. 363 (70th Cong. 1928).

In 1932, Congress extended business licensing requirements to additional businesses, including tour guides. Act of July 1, 1932, 47 Stat. 550. Expanded licensing was necessary because some classes of business were "escaping the payment of license taxes," although requiring "inspection or supervision, or

4

occupy[ing] public space." H.R. Rep. No. 72-1385 (May 19, 1932); *see* 1932 Cong. Rec. H12871-72 (remarks of Rep. Gilbert that the new licensing legislation was "based, in the main, upon the inspection required and the expense of controlling those businesses").

As to tour guides, the 1932 law provided: "No person shall, for hire, guide or escort any person through or about the District of Columbia, or any part thereof, unless he shall have first secured a license to do so." Act of July 1, 1932, ¶ 38, 47 Stat. at 558. Congress authorized the then-Commissioners of the District of Columbia to "make reasonable regulations for the examination of all applicants for such licenses and for the government and conduct of persons licensed hereunder, including the power to require said persons to wear a badge while engaged in their calling." *Id.*

### B.    The current statute.

The 1932 statute requiring tour guides to be licensed remains in effect and unchallenged today. Codified at D.C. Code § 47-2836(a), entitled "Guides," the core 1932 language is unchanged: "No person shall, for hire, guide or escort any person through or about the District of Columbia, or any part thereof, unless he shall have first secured a license to do so." The law also continues to provide for implementing regulations: "The Council of the District of Columbia is authorized and empowered to make reasonable regulations for the examination of all

5

applicants for such licenses and for the government and conduct of persons licensed" under the statute, including the power to require guides to wear a badge while working. *Id.* The Council has delegated its authority to the Director of the District's Department of Consumer and Regulatory Affairs ("DCRA") "to implement the basic business license system outlined" in the Code "by appropriate regulation." D.C. Code §§ 47-2851.01(4), 47-2851.20.

Under a provision dating back to the original statute Congress enacted in 1902, as subsequently amended by the Council, any violation of the tour guide licensing statute may subject an individual, upon conviction, to a fine of not more than $300 or imprisonment for not more than 90 days. D.C. Code § 47-2846.

### C.     The regulations.

DCRA promulgated the current regulations in 2010. 57 D.C. Reg. 6116 (July 16, 2010); 19 DCMR 1200 *et seq.* Under the regulations, a business that offers, for a fee, to conduct walking tours, bicycle tours, or tours where "customers operate self-balancing personal transport vehicles" like Segways must be licensed as a sightseeing tour company. 19 DCMR § 1200.3. A sightseeing tour company must qualify for a basic business license. 19 DCMR § 1202.2.

Individual tour guides must also be licensed. No person may act as a sightseeing tour guide in the District unless the person holds a valid sightseeing tour guide license issued by DCRA. 19 DCMR § 1201.1. The regulations define

both "tour guide" and "sightseeing tour guide" as "any person who engages in the business of guiding or directing people to any place or point of interest in the District, or who, in connection with any sightseeing trip or tour, describes, explains, or lectures concerning any place or point of interest in the District to any person." 19 DCMR § 1200.1.

To qualify for a tour guide license, a person must be at least 18 years old, be proficient in the English language, and not have been convicted of certain felonies. 19 DCMR § 1203.1(a)-(c). In addition, an "applicant for a sightseeing tour guide license must pass an examination under the supervision of the Director [of DCRA], or the Director's designated agent, covering the applicant's knowledge of buildings and points of historical and general interest in the District." 19 DCMR § 1203.3.

A vehicle such as a bus operated by a licensed sightseeing tour company shall have at least one licensed sightseeing tour guide on board during sightseeing tours of the District, but this requirement does not apply to vehicles that use only an audio recording during the tour. 19 DCMR § 1204.3. A "driver of such a sightseeing tour vehicle who talks, lectures, or otherwise provides sightseeing information to passengers while the vehicle is in motion must be licensed as a sightseeing tour guide." *Id.* Drivers of sightseeing vehicles are otherwise regulated under 31 DCMR § 1000 (relating to vehicles for hire), and must take a test concerning "knowledge of the Metropolitan Area." 31 DCMR § 1008.4.

7

The regulations set forth other provisions protecting the interests of tour guide customers: a tour guide must wear a badge, and shall disclose the fees for a sightseeing tour in writing prior to the start of the tour and not charge any additional amount thereafter, and shall not generally leave a customer behind at a point of interest as the tour moves on to the next point.  19 DCMR § 1205.

### D.        The tour guide professional licensing exam.

In accordance with the regulations, DCRA administers a "Sightseeing Tour Guide Professional Licensing Examination" consisting of 100 multiple choice questions that may cover any of fourteen subjects concerning the District of Columbia, including its architecture, government, historical events, museums and zoo, monuments and memorials, sculptures and statues, and regulations.  JA 148. Questions "are formed from data found in" nine specified sources, including the District's tour guide regulations, the District's Historic Preservation Office website, and tourist guides to Washington like the Michelin "Green Guide Washington."  JA 148.  The District issues a study guide listing those sources.  JA 148.  Applicants need only obtain a score of 70% to pass the exam.  JA 148.  The examination fee is $200 for the first examination and $115 for re-examination.  JA 148.

### E.        The similarity of the District's licensing scheme to those of other cities and the federal government.

Many cities in the United States with heavy tourist trades regulate and license tour guides as an exercise of governmental police power.  New York City's

8

law is similar to the District's in that a license is required for any person "who engages in the business of guiding or directing people to any place or point of public interest or who, in connection with any sightseeing trip or tour, describes, explains or lectures concerning any place or point of public interest to any person within the city."  20 N.Y.C. Admin. Code § 242.  The requisite examination covers topics including general knowledge of New York City and its history, landmarks, museums, architecture, and sculptures, as well as religion, New York literature, and ethnic food.   N.Y.C. Dep't of Consumer Affairs, *Professional Licensing Examination: New York City Sightseeing Guide Reference*, http://www.nyc.gov/ html/dca/downloads/pdf/study_reference.pdf (last visited Nov. 11, 2011).

Other cities have comparable requirements.  Charleston, South Carolina, for example, requires tour guides to be licensed in order to "maintain, protect and promote the tourism industry and economy of the city," and requires a person to pass a written and oral examination to qualify for a tour guide license.  Charleston, S.C., Code of Ordinance §§ 29-1, 29-58.  In Charleston, "tour guide" is defined simply as a person who "acts or offers to act as a guide for hire through parts" of Charleston, when the primary purpose is not transportation.  *Id.* § 29-2.  Similarly, in Savannah, Georgia, no person shall act or offer to act as a tour guide for hire, or play a role during a tour, unless the person first obtains a tour guide permit, including passing an examination given by the city designed to "test the applicant's

9

knowledge of history and architecture of the city," and the test must be taken and the license renewed every three years.  Savannah, Ga., Ordinance §§ 6-1502(a), 6-1514.  Philadelphia too requires that tour guides become certified by, inter alia, being at least sixteen years old, submitting a written application, and taking and passing a written examination.  Phil. Code § 9-214(3), (12) and (13).

In addition, the federal government requires licenses for persons who act as guides in national military parks, and the licensing process requires an examination concerning the history of the battle at the park and features of historical interest. 36 C.F.R. § 25.2.  "The story of the guides shall be limited to the historical outlines approved by" the government "and shall be free from praise or censure."  36 C.F.R. § 25.2(b).

## 2.    The Facts Specific To The Plaintiffs' Claim.

The essential facts here are undisputed.

The District and the district court noted below, and the plaintiffs did not dispute, that the District of Columbia is the third-most popular tourist destination in the United States, after Times Square and the Las Vegas strip, and it attracts approximately 15 million visitors each year.  JA 95; Record Document ("RD") 9 at 33 (citing U.S. Department of Commerce data).  It is estimated that travel and tourism supports more than 66,000 full-time jobs in the District, generating some $2.6 billion in wages.  RD 9 at 33.

The plaintiffs Tonia Edwards and Bill Main own and operate "Segs in the City," a sightseeing tour company that provides guided tours in the District on Segway personal transportation devices.  Edwards Decl. ¶ 2; Main Decl. ¶ 2; JA 7, 14.  Much like DCRA, plaintiffs require their own tour guides to "undergo training prior to being allowed to conduct tours," including reading "various publicly-available books (such as the Blue Guide to Washington, D.C.) providing information on the" area.  JA 108.

After the customers learn how to safely ride a Segway, they ride along a tour route established by Segs in the City with a tour guide—either one of the plaintiffs or a guide retained as an independent contractor by Segs in the City.  JA 102, 170-71, 175-76.  The guide explains where the group is headed, points out and describes points of interest along the route, and answers questions.  JA 170-71, 175-76.  The tours last from one to three hours.  JA 171.  The plaintiffs conceded below that "a licensed guide can say anything he or she wants" on a tour, without restriction by the District.  JA 31.  There is also no dispute that the District does require those who provide tour guide services to seek licenses only if they do so "for hire" rather than for free, D.C. Code § 47-2836(a), and that the District can require all those who do business in the District to obtain basic business licenses, D.C. Code § 47-2851.03d.  See Br. 46 (Main and Edwards already possess general business license).

11

Edwards and Main refuse to obtain a tour guide license because of the cost of the application ($200) and the burden of studying for the licensing exam, and also because they believe the licensing scheme violates their First Amendment right to free speech.  JA 101, 170-71, 176-77.  According to Main, his "most important objection" is "one of principle" that he has the "right to tell [his] customers what [he] think[s] about D.C." without seeking permission from the District or taking a test.  JA 177 at ¶ 25.  At least three of the independent contractors who work as guides for Segs in the City have obtained tour guide licenses, and others were in the process at the time of proceedings below.  JA 171, 175.

The District submitted a copy of a sample licensing exam under seal to the plaintiffs and the court.  (That filing has been lodged in this Court as a sealed supplement to the Joint Appendix.)  As described by the district court, certain questions on the exam are "odd, obscure, or picayune," JA 204 (quoting plaintiffs' summary judgment motion), but "the vast majority of questions are generally consistent with the District's stated interest in ensuring basic competence of those conducting tours for pay."  JA 204.  The plaintiffs do not premise their challenge to the licensing scheme on the content of this or any other particular exam.

The District has not cited the plaintiffs or any other tour guide for operating without a license since at least October 1, 2005.  JA 20.

12

### 3.      Proceedings Below And The District Court's Decision.

The plaintiffs filed a complaint for declaratory and injunctive relief, claiming that the tour guide licensing scheme violates their right to free speech as guaranteed by the First Amendment. RD 1 at ¶ 67. They sought a declaratory judgment that D.C. Code § 47-2836 and the regulations promulgated thereunder violate the First Amendment, both facially and as applied to the plaintiffs, and an injunction prohibiting the District from enforcing those laws. RD 1 at 10.

Initially, the plaintiffs moved for a preliminary injunction and the District moved to dismiss the action because the complaint was meritless. RD 7, 9. The district court denied the injunction, explaining in a well-reasoned opinion that the plaintiffs were unlikely to prevail on the merits of their case because the tour guide licensing scheme is content neutral and passes intermediate scrutiny. JA 73, 84, 94, 97. The court denied the District's motion to dismiss without prejudice, however, pending the parties submitting documents under seal to the court, like the licensing exam itself. JA 73, 99. After discovery, the parties filed cross-motions for summary judgment. RD 36, 37.

The court granted summary judgment to the District. JA 183, 184. The court issued an opinion that built on its analysis denying a preliminary injunction. JA 184. The court concluded that the tour guide licensing requirements target the non-expressive, non-speech conduct of guiding, directing, and escorting a

13

commercial sightseeing trip or tour, only incidentally burden speech, and are therefore subject only to intermediate scrutiny under the First Amendment.  JA 193.[1]  As it explained, the act of guiding or directing in and of itself does not convey any message or express any idea.  JA 193-94.  Although a tour guide also typically communicates information and opinions about places of interest in the District, and part of the regulation mentions speech ("describes, explains, or lectures"), the court reasoned that speech "is not the impetus for the licensing requirement," and the regulations are not directed toward regulating speech or its content.  JA 194-95, 197.

The court concluded that the licensing scheme satisfies intermediate scrutiny because it furthers a substantial governmental interest unrelated to the suppression of speech—specifically, the scheme "serves a basic consumer protection function by ensuring that persons selling their services—those of a knowledgeable and trustworthy guide—are at least minimally qualified to do so."  JA 202-03.  It explained that "[n]othing about the District's interest in keeping visitors from dangerous, unethical, or uniformed guides is remotely related to the suppression of free expression."  JA 203 (citation omitted).  In addition, the court held that the

---

[1]     The District argued that the licensing scheme here is a professional or occupational licensing requirement that did not implicate the First Amendment and was subject only to rational basis review.  JA 193 n.5.  The court did not reach this issue, concluding that the regulations survived even under the heightened standard of intermediate scrutiny.  JA 193 n.5.

testing requirement and the other minimal requirements for licensure in the regulations satisfy intermediate scrutiny because they "protect more than a narrow interest in safeguarding tourists from false speech" including "ensur[ing] that prospective guides are who they say they are: persons with at least a minimal grasp of the history and geography of Washington, D.C."  JA 203.  Further, the court determined that the "plaintiffs have not identified any restriction on their speech under the scheme that is any more than the incidental byproduct of the regulation of their conduct as tour guides."  JA 204.  The questions on the tour guide licensing examination were "generally consistent with the District's stated interest in ensuring basic competence of those conducting tours for pay."  JA 204.  Thus, the court concluded, "none of plaintiffs' objections to the requirement of licensure are of constitutional magnitude or reflect the type of burden that offends the First Amendment."  JA 204.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  This Court's review of a district court's grant of summary judgment is de novo.  *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011).

15

## SUMMARY OF ARGUMENT

The district court correctly held that the licensing scheme does not violate the First Amendment.  Intermediate rather than strict scrutiny applies to the District's licensing scheme, and the record amply supports the district court's conclusion that that scheme satisfies intermediate scrutiny.

1. Intermediate scrutiny applies here.  The licensing scheme for tour guides is a routine exercise of the District's police power that allows it to regulate trades and callings in order to protect the public from the untrustworthy, the incompetent, and the irresponsible.  This is so even though tour guides speak to customers on their tours, just as the District can regulate lawyers, psychiatrists, auctioneers, and salespeople.  This type of occupational licensing is routinely upheld against First Amendment challenge without implicating strict scrutiny.

Intermediate scrutiny applies here because the statute and regulations are content neutral in that they are justified without reference to the content of the regulated speech.  Strict scrutiny is warranted where the government has restricted speech based on a disagreement with the message it conveys.  That is not the case here, where the licensing scheme is not based on what a tour guide will say.  It does not affect the content of any tour, and neither requires nor prohibits any speech of any kind.  As the plaintiffs conceded, a licensed guide can say anything on a tour, without restriction by the District.

16

To begin with, the plaintiffs do not seriously contest that the licensing statute itself is content neutral. It requires a license for a person to "guide or escort any person through or about" the District "for hire." It plainly requires a license regardless of any message a tour guide may wish to convey. There is no indication that either Congress or the Council were motivated by any hostility to any message or any speaker.

The regulations implementing the statute are also content neutral because they are clear that speech is not the impetus for the licensing requirement. What the plaintiffs claim is content-based regulation is, instead, a content neutral manner of defining the profession being regulated. The first prong of the regulatory definition of "tour guide," like the statute, is triggered by conduct, not speech. It applies to those who guide or direct people in the District. Again, there is no animosity to any message or speaker.

The second prong of the regulation defining "tour guide" is also content neutral. Although it applies to a person who "describes, explains, or lectures," that is so only "in connection with a sightseeing trip or tour." Precedent establishes that a law is not content-based simply because it applies to a content-based category of persons, where there is no restriction of the content of those persons' speech. Here, even if the second clause applies depending on the content of speech (describing, explaining, lecturing), the regulation is justified without regard to the content of

17

any such speech.  The regulation defines who are the "tour guides" subject to licensure with reference to their speech, but regulates only their conduct, guiding, and directing people around the District for hire.  It is still the fact that the customers are being guided or directed around town that triggers the licensing requirement.  As such, even the second prong of the regulation is content-neutral and subject to only intermediate scrutiny.

In any event, the plaintiffs lack standing to challenge the second clause because they and any tour guides they hire would be covered by the first clause since they are engaged in the business of guiding or directing people in the District regardless of any describing, explaining, or lecturing. The second clause distinguishes the situation where a bus driver is driving a tour bus, but a licensed tour guide is on board to describe, explain, or lecture, as the bus driver assists in the guiding and directing the bus around town.  Here, the plaintiffs do not conduct their tours by bus, and are covered by the first clause of the regulation.

Furthermore, the licensing scheme is content neutral despite the testing requirement.  Although applicants for tour guides are tested on their knowledge of buildings and points of interest in the District, no such information is subsequently required or prohibited to be spoken on any tour.  The purpose of the test is to ensure some minimal competence by those who guide and direct people around the District to protect that consumer experience.  Licenses are issued based on

18

straightforward, objective measures of competence and character, unrelated to the content of any speech.

2. There is ample justification for the district court's conclusion that the licensing scheme passes intermediate scrutiny. The District did not need to introduce studies, statistics, or empirical evidence to support the law. Under Supreme Court case law, a city may justify speech restrictions by reference to history, consensus, and common sense, including anecdotes pertaining to different locales altogether. Under this standard, it is plain that the District had a general concern that tourists be protected from fraud and unethical business practices. Soon before Congress made tour guides subject to licensure in 1932, a Washington Post editorial noted that unlicensed guides were intimidating and annoying visitors to the District. Additionally, more modern laws, legislative policy statements, and case law from other cities with heavy tourist trades support the conclusion that the District has an interest in maintaining, protecting, and promoting the tourism industry and economy of the District, and assuring strangers visiting the city that they will be properly cared for and guided. Indeed, the Supreme Court itself has made plain that local governments generally have a compelling interest in regulating professions and licensing practitioners to protect the public health and safety.

19

The plaintiffs have not presented any reason to doubt the District's asserted justifications for tour guide licensure. The licensing scheme is consistent with the First Amendment.

## ARGUMENT

I. **As The District Court Held, Intermediate Scrutiny Rather Than Strict Scrutiny Applies To The District Of Columbia's Regulations Of The Tour Guide Profession.**

   A. **Strict scrutiny would be inconsistent with the longstanding acceptance of licensing requirements for occupations when needed to protect the public, even where a substantial portion of the occupation at issue involves speech.**

The District of Columbia agrees that the First Amendment protects tour guides' speech to their customers during guided tours, and that the government has no "power to restrict expression because of its message, its ideas, its subject matter or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95-96 (1972). However, the government has latitude to enact laws that only incidentally restrict speech in a content neutral manner, and such laws are reviewed under an intermediate scrutiny standard, not strict scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642, 661-62 (1994); *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). The content neutral regulatory scheme at issue here implicates protected speech so minimally as to require only intermediate scrutiny.

20

The District's tour guide licensing scheme is a routine business licensing provision authorized under the District's police powers.[2]  Of course, "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights."  *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 438-39 (1963).  But the type of occupational licensing at issue here is routinely upheld against First Amendment challenge without strict scrutiny, even where the profession or occupation incidentally involves speech.

For over a century, it has been "too well settled to require discussion ... that the police power of the states extends to the regulation of certain trades and callings."  *Watson v. Maryland*, 218 U.S. 173, 176 (1910); *see Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 459 (1978) (attorney's in-person solicitation of clients is "subject to regulation in furtherance of important state interest"); *Graves v. Minnesota*, 272 U.S. 425 (1926) (upholding licensing of dentists); *Dent v. West Virginia*, 129 U.S. 114, 121-22 (1889) (licensing of doctors).

Justice Jackson eloquently summarized the state's interest in licensing certain "callings" to protect consumers:

---

[2]     The power delegated to the District's local government under the Home Rule Act is akin to the police power of states.  D.C. Code § 1-203.02 (delegating "legislative power" over "all rightful subjects of legislation within the District," with certain exceptions); *see District of Columbia v. John R. Thompson*, 346 U.S. 100, 110 (1953) (construing such language to delegate power "as broad as the police power of a state").

> The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public from the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system.

*Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring); *see Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995). Consumer protection is a legitimate governmental interest in this regard. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189-90 (1997).

It is undisputed that "the licensing of sightseeing guides in a large metropolis falls within the police powers of the local government." *People v. Bowen*, 11 Misc. 2d 462, 464-65 (N.Y. Spec. Sess. 1958). The regulations here apply to tour guides conducting tours *for hire*, which is a regulation of business within the District's police power. As the court explained in *Bowen* when deciding that New York City has the power to license tour guides and prescribe reasonable standards and qualifications as prerequisites to the granting of licenses:

> Every year, millions of visitors come to New York, and the health, safety and morals of many of them are entrusted to city *cicerones*.[3] On the latter rests the responsibility of seeing that strangers in our midst are properly cared for and guided. Guides must be persons of knowledge and integrity—not steerers for fly-by-night operators. It is

---

3    A "cicerone" is "a guide who conducts sightseers." Webster's New Collegiate Dictionary 201 (1973).

a matter of public concern and interest that they be carefully supervised.

*Id.*

The District can regulate tour guides under its police powers even though tour guides describe, explain, or lecture their customers on tours—much as it can regulate lawyers, psychiatrists, auctioneers, and salespeople.  As the Supreme Court has explained, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *see also Ohralik*, 436 U.S. at 456 ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of the activity.").

This case does not, as the plaintiffs and their amicus the Cato Institute would have it, warrant strict scrutiny because it is akin to placing prior restraints on authors selling books, speakers charging admission to a lecture, or filmmakers selling DVDs.  Providing a tour is different from publishing a book or giving a lecture, because those activities involve only speech and not the act of being physically guided around an unfamiliar locale, at the mercy of the guide's competence and good will.  Tour guides are regulated because they provide a particular person with a particular service, and the purpose of the licensing

requirements is to make sure tour group participants get what they pay for—a safe tour, conducted by someone with a minimum quantum of professionalism. The licensing requirements serve the government's interest in having tourists treated fairly and safely, and assuring that they are not swindled or harassed by charlatans. The license provides some assurance that they have a particular competence in what they do.

This type of occupational licensing scheme is routinely upheld against First Amendment challenge without implicating strict scrutiny. *Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011) (upholding state licensing requirement for interior designers practicing in commercial settings without invoking strict scrutiny because regulations governed occupational conduct with merely incidental effect on speech); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043 (9th Cir. 2000) (holding that licensing requirements for psychoanalysts did not implicate strict scrutiny); *IDK, Inc. v. Clark Cnty.*, 836 F.2d 1185, 1195 (9th Cir. 1988) (upholding licensing requirements for escort services and those working as escorts without applying strict scrutiny); *Kev, Inc. v. Kitsap Cnty.*, 793 F.2d 1053 (9th Cir. 1986) (upholding licensing requirements for erotic dancers and operators of erotic dance studios); *Kagan v. New Orleans*, ___ F. Supp. 2d ___, 2013 WL 3440154, at *4 (E.D. La. July 9, 2013) (upholding New Orleans tour guide licensure requirements under intermediate scrutiny); *Enten v. District of*

24

*Columbia*, 675 F. Supp. 2d 42 (D.D.C. 2009) (upholding requirement that street vendor who sold political buttons obtain vendor license); *cf. Ohralik*, 436 U.S. at 456 (citing "numerous" examples of professional communications "that are regulated without offending the First Amendment," including corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for protected activities).  The licensing scheme here should not be treated differently by imposing strict scrutiny upon it.

> **B.    Intermediate scrutiny applies because the statute and regulations at issue here are content neutral, especially considering that the parties agree that they are simply an attempt to define the profession at issue.**

Laws regulating speech based on its content are reviewed under a strict scrutiny standard and will be upheld only if they promote a compelling governmental interest and employ the least restrictive means to further that interest.  *Time Warner Entm't Co., L.P. v. FCC*, 93 F.3d 957, 966 (D.C. Cir. 1996).  However, only intermediate scrutiny is warranted when the law is content neutral because content neutral speech poses a "less substantial risk of excising certain ideas or viewpoints from the public dialogue."  *Am. Library Ass'n v. Reno*, 33 F.3d 78, 84 (D.C. Cir. 1994) (quoting *Turner Broad. Sys.*, 512 U.S. at 642).  Here, the determination that the licensing scheme is content neutral "direct[s] [the] path" of the Court's scrutiny to intermediate review.  *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 516 (D.C. Cir. 2010).

"Content neutral" speech restrictions are those that are justified without reference to the content of the regulated speech. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.*; *see also Turner Broad. Sys.*, 512 U.S. at 641.

Here, the District is not suppressing speech based on the message. As the plaintiffs conceded below, "a licensed guide can say anything he or she wants" on a tour. A. 31. What they contend is content-based regulation is instead a content neutral manner of defining the industry being regulated.

       1.     The tour guide licensing statute itself is content neutral.

The statute at issue provides that "[n]o person shall, for hire, guide or escort any person though or about the District of Columbia, or any part thereof, unless he shall have first secured a license to do so." D.C. Code § 47-2836(a). The statute never references speech and, as the district court concluded, "is 'indisputably content neutral on its face.'" JA 88 (quoting *Boardley*, 615 F.3d at 516). "This statute, in effect and unchallenged since 1932, makes no reference to speech at all; its focus is only on conduct. . . . Clearly [it] requires a license regardless of any

26

message a tour guide may wish to convey." JA 88. As the district court explained, the plaintiffs "provided no basis for the [c]ourt to conclude that Congress and then the Council of the District of Columbia were 'motivated to adopt [this statute] by [their] agreement with or hostility toward any particular message or speaker.'" JA 88 (quoting *Boardley*, 615 F.3d at 516).

Under the statute, tour guides are not barred from speaking, and the statute does not regulate the content of any tour guide's speech. The law does not require a tour guide to submit a tour program for approval. No one monitors the content of a tour guide's speech or any stories they tell. Tour guides may say whatever they wish about any site, or anything else for that matter; the law simply does not regulate the content of their speech. Much as with the New Orleans licensing scheme that has been upheld, "[t]here are no scripts, no sacred cows or historical truth, no restraints on taste or opinion, and no topic (point-of-interest related or not) is off limits." *Kagan*, 2013 WL 3440154, at *4.

The only part of the statute that conceivably could be considered content-based is the definition of the industry being regulated: those who "for hire, guide or escort." D.C. Code § 47-2836(a). But neither the plaintiffs nor their amicus seriously suggest that this part of the statute renders it content-based. Nor could they reasonably do so, as such an attempt to define what profession is subject to licensing is plainly content neutral.

27

2.      The regulations are also content neutral.

The plaintiffs' real objection is with the regulations.  But the district court was again correct to hold that the "plain language of the regulations makes clear that speech is not the impetus for the licensing requirement."  JA 197.  The key regulation provides that a tour guide is "any person who [1] engages in the business of guiding or directing people to any place or point of interest in the District, *or* who [2] in connection with any sightseeing trip or tour, describes, explains, or lectures concerning any place or point of interest in the District to any person."  19 DCMR § 1200.1 (emphasis added).  And although the plaintiffs also challenge the testing requirement, it does not change the content neutral nature of the definition of the profession subject to licensing.

    a. The first prong of the regulatory definition of "tour guide" is content neutral because it references conduct, not speech.

The first clause of the regulatory definition of "tour guide"—reaching one who "engages in the business of guiding or directing people to any place or point of interest in the District"—is specifically triggered by conduct: guiding or directing people.  Like the statute, it makes no reference to speech at all, but focuses only on conduct, and requires a license regardless of any message a tour guide may wish to convey.  *Boardley*, 615 F.3d at 516.  There is no animosity to any particular message or speaker.  "So long as the justifications for regulation

28

have nothing to do with content," then the regulation is "properly analyzed as content neutral." *Boos v. Barry*, 485 U.S. 312, 320 (1988); *see Nat'l Ass'n for the Advancement of Psychoanalysis*, 228 F.3d at 1055-56 (rejecting First Amendment challenge to state licensing scheme for mental health professionals, because they were content neutral and speech was not suppressed based on its message).

> b.   The second prong of the regulatory definition of "tour guide" also references conduct, not speech, when properly construed, and in any event the plaintiffs lack standing to challenge this prong.

Nor does the second clause of 19 DCMR § 1200.1 entitle the plaintiffs to relief.  As the district court noted, "at first glance" that clause appears to directly regulate speech since it applies when a person "describes, explains, or lectures concerning any place or point of interest in the District to any person."  JA 195 n.6.  But that clause has the qualifier that it applies "in connection with any sightseeing trip or tour," which clarifies that the regulations apply only when an individual is otherwise engaged in the activity of escorting a tour.  JA 195 n.6.  The regulations address the in-person service of conducting a tour, not the information conveyed or stories told on the tour.

The regulation is content neutral even though it applies to a group of people who are defined by what they do, describing, explaining, or lecturing as they guide and direct their customers around the District.  *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("[I]t has never been

29

deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (quoting *Giboney*, 336 U.S. at 502)).  This Court has rejected an argument that an act "must be deemed content based because it applies to a category of persons that is defined by the content of the materials they produce," because "the fact that those covered by the Act are content defined does not affect the content of the speech they are engaged in . . . ." *Am. Library Ass'n*, 33 F.3d at 86; *see also Renton*, 475 U.S. at 47-48 (challenged ordinance restricting adult theaters in residential areas was content neutral even though it applied only to a content-defined class of theaters).  Here, it is still the fact that the customers are being guided or directed around town that triggers the licensing requirement.

Even if the second clause of the regulation *applies* depending on the content of speech (when a tour guide describes, explains, or lectures concerning any place or point of interest in the District), the regulation is *justified* without regard to the content of the speech.  The regulation does not suppress expression due to any disagreement with any message conveyed by any tour guide.  *See Kagan*, 2013 WL 3440154, at *5 (citing *Illusions-Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 308 (5th Cir. 2007)).  The licensing scheme does not create classes of favored and disfavored speech, does not create a substantial risk of eliminating certain ideas or

viewpoints, and was not enacted due to any disagreement with the message conveyed. Rather, as explained more fully below, the licensing scheme was enacted to protect the District's tourism industry by protecting the safety of tour group participants and reducing the chance they would be swindled by unregulated charlatans. The reference to the content of a tour guide's speech in the regulation is necessary because "it would otherwise be difficult to describe the act, the conduct, requiring a license." *Kagan*, 2013 WL 3440154, at \*6. Significantly, the plaintiffs do not propose any other definition of "tour guide" that they think would meet constitutional muster (let alone one that would be different in practical import).

This is not a case like *Freedom v. Maryland*, 380 U.S. 51 (1965), where the Supreme Court unanimously struck down a state statute that made it unlawful to exhibit a motion picture without having first obtained a license. This case is more akin to *Renton*, where the Court upheld a zoning ordinance that prohibited adult motion picture theaters from locating within 1,000 feet of churches, schools, and certain residential areas. 475 U.S. at 48. The ordinance prohibited conduct by reference to the type of movie theater involved, treating theaters that specialized in adult films differently from other kinds of theaters. But the regulations were nevertheless content neutral because the content of the films being shown in the theaters was irrelevant. "In short, the ordinance in *Renton* did not aim at the

31

suppression of free expression." *Boos*, 485 U.S. at 320. Similarly here, the regulations may define tour guides with reference to their speech, but the licensing scheme does not suppress free expression, but rather regulates conduct and protects the consumer experience of being guided and directed around the District.

In any event, the plaintiffs lack standing to challenge the second clause of 19 DCMR § 1200.1 applicable to someone who describes, explains, or lectures in connection with a sightseeing trip or tour, because they and any tour guide they hire would be bound by the first clause. The second clause could be severed from the law and the first clause would still be applicable to the plaintiffs and require them and those they hire to be licensed to legally operate as tour guides for hire. Accordingly, they have no standing to challenge that clause because they are covered under the law by the first clause in any event. This Court is required to address standing even if the lower court did not pass on it and even if parties did not raise the issue, as it is a jurisdictional issue. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990).

In order to establish standing, litigants must show a substantial probability that the requested relief would alleviate their asserted injury. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-46 (1976). In other words, in order to pursue their challenge to the second clause of 19 DCMR § 1200.1, the plaintiffs must show that, "were a court to grant [them] the relief they request, their injury would

32

be redressed." *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258, 263 (D.C. 1980).

This case will likely rise and fall on the propriety of the first clause. If the Court upholds that first clause, then the licensing scheme applies to the plaintiffs thereunder, and the plaintiffs can achieve no personal benefit by challenging the second clause. The controversy concerning the second clause is then purely academic, so the Court need not address its merits.

This reading does not render the second prong of the regulation superfluous. *Cf. C.F. Commc'ns Corp. v. FCC*, 128 F.3d 735, 739 (D.C. Cir. 1997) (court should not construe a statute so as to render any provision "inoperative or superfluous, void or insignificant"). The second prong distinguishes the situation where a bus driver is driving a tour bus but a licensed tour guide is on board to describe, explain, or lecture about points of interest, as the driver assists in guiding or directing the customers around town. *See* 19 DCMR § 1204.3 (tour bus must have a licensed tour guide on board). In that circumstance, it is still the fact that the customers are being guided and directed around town that triggers the licensing requirement for a tour guide on board, even if it is the bus driver and not the tour guide who is physically driving the bus. In any event, here, the plaintiffs do not

ride a bus while they describe, explain, or lecture, so they are covered by the first prong of the regulation.[4]

    c. The testing requirement does not change the content neutral nature of the licensure requirement.

  The plaintiffs argue that the fact that tour guides must take a history test shows that the District is concerned with the content and accuracy of what guides say on a tour. This is not so because the content of any tour is not regulated in any way whatsoever. Applicants for a tour guide license are tested on their "knowledge of buildings and points of historical and general interest in the District," 19 DCMR § 1203.3, but no such information is subsequently required or prohibited to be spoken on any tour or at any other time. The licensing scheme does not create any classes of favored or disfavored speech. There is no risk of eliminating particular ideas or viewpoints. *Cf. Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002)

---

[4] If, however, the Court reaches the second prong of the definition of "tour guide" and believes it might be read to create a constitutional problem where the first prong would not, the Court should interpret the second prong to be surplusage. To be sure, interpretations of regulations that render some of the text surplusage are disfavored. At the same time, this Court has a duty to avoid interpretations of regulations that render those regulations unconstitutional, if reasonably possible. *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (applying doctrine of constitutional avoidance to regulation). It is at least reasonable to read the second prong of the regulatory definition of "tour guide" as a subset of the first prong, as even one who rides on rather than drives a tour bus and, "in connection with any sightseeing trip or tour, describes, explains, or lectures concerning any place or point of interest in the District" can also be thought as one who "engages in the business of guiding or directing people to any place or point of interest in the District." 19 DCMR § 1200.1 (emphasis added).

34

(striking down state law prohibiting physicians from recommending medical marijuana to patients).

The licensing scheme for tour guides requires only that tour guides take an examination to demonstrate a baseline knowledge of buildings and points of historical and general interest in the District. As the district court concluded, "the purpose of the examination is to ensure some minimal competence or knowledge for those who" guide or direct people around the District, whether they choose to speak or not. JA 94. The testing requirement protects "more than a narrow interest in safeguarding tourists from false speech." JA 203. This and other regulatory requirements "ensure that prospective guides are who they say they are: persons with at least a minimal grasp of the history and geography of Washington, D.C." JA 203. "Nothing about the District's interest in keeping visitors from dangerous, unethical, or uniformed guides 'is remotely related to the suppression of free expression.'" JA 203 (citing *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 13 (D.C. Cir. 2008) (upholding government prohibition on educational travel to Cuba to limit the flow of American currency to that country)).

Here, the licensing scheme does not dictate the content of what is said during the tours; instead, it merely sets forth some minimal knowledge requirements for the persons who wish to work as tour guides in the District. The

District's concern is unrelated to the content of tour guides' speech, but is "instead related to the *quality* of the *consumer's experience*, which a City dependent on tourism has a substantial interest in protecting." *Kagan*, 2013 WL 3440154, at *5. The District protects that experience by "weeding out tour guides too dangerous to lead strangers around a strange city and too unserious to be willing to study for a single exam." *Id.*; *see also Nat'l Ass'n for the Advancement of Psychoanalysis*, 228 F.3d at 1056 (rejecting First Amendment challenge to state licensing scheme for mental health professionals, because they were content neutral and, although they required certain training, speech was not suppressed based on its message).

Licenses are issued based on straightforward, objective measures of competence and character, and are routine when the applicant passes the test and the other screening criteria. As such, the licensing requirements here are content neutral.

**C.    The case law that the plaintiffs and amicus cite as requiring strict scrutiny is distinguishable.**

Amicus Cato Institute cites Justice White's concurring opinion in *Lowe v. SEC*, 472 U.S. 181 (1985), to argue that strict scrutiny is warranted because, to the extent professional licensing is generally subject to lesser scrutiny, tour guides are not "professionals" subject to lesser First Amendment protection. Amicus Br. 11. Amicus reads too much into *Lowe.*

36

*Lowe* addressed whether the Securities and Exchange Commission ("SEC") could prevent an unregistered financial adviser from publishing newsletters containing investment advice considering that the advice was not specifically tailored to the needs of individual clients. The *Lowe* majority did not reach the constitutional question of whether the registration requirement violated the First Amendment, but decided the case on statutory grounds. 472 U.S. at 210-11. In his concurrence, Justice White reached the constitutional issue and considered the SEC's action to be an unconstitutional restraint of speech under "even the reduced level of scrutiny called for by restrictions on commercial speech." *Id.* at 235.

Under the circumstances there, Justice White's concurrence reasoned that where "the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such," violative of the First Amendment. *Id.* at 232.

Justice White certainly did not conclude that strict scrutiny applies to all occupational licensing that minimally implicates speech—and certainly his views in concurrence are not binding on this or any other Court. In any event, tour guides are not like the plaintiff in *Lowe*, who merely issued a newsletter, and never

37

had any in-person contact with his readers whatsoever.  In contrast, here, tour guides meet with their customers in person, spend hours together moving around the District into areas where the customers will not necessarily know where they are or how to return to their starting point.  There is a relationship of trust and reliance.  Customers rely on the tour guides to safely take them back to their starting point, and not abandon them in some far-flung spot, or charge them additional amounts to take them back.  *Lowe* in fact supports the licensing of tour guides here because there is a personal relationship—relationship of trust—between the tour guide and the customer.

Further, this is not a situation like *Lowe* where the SEC was attempting to prohibit altogether publication of a newsletter.  The District may validly forbid a person without a license from operating as a tour guide for pay, because it is not otherwise prohibiting the person from speaking to the public about the District's attractions and points of interest.  As Justice Jackson explained, a state's "well-settled right reasonably to regulate the pursuit of a vocation" allows the state to forbid one without a license to practice law, even though the state may not prohibit an unlicensed person from making a speech about the law, and likewise "the state may prohibit the pursuit of medicine as an occupation without its license" even though it could not prohibit "urging persons to follow or reject any school of medical thought."  *Thomas*, 323 U.S. at 544 (Jackson, J., concurring).  The District

38

has not banned all speech by tour guides. *Cf. Argello v. City of Lincoln*, 143 F.3d 1152 (8th Cir. 1998) (ordinance banning all fortunetelling and speech that revealed or pretended to reveal past or future events was impermissible content-based regulation of speech). The District is not prohibiting the plaintiffs from publishing their stories about the District. They are simply requiring that the plaintiffs be licensed to do so while guiding or directing people around the District for pay.

Nor does *Sorrell v. IMS Health Inc.*, 564 U.S. ___, 131 S. Ct. 2653 (2011), cited by the plaintiffs (Br. 33), require strict scrutiny. *Sorrell* involved a Vermont law that strictly limited the sale by pharmacies of records showing local doctors' prescribing habits and banned outright the publication of such records by pharmaceutical marketing companies, while permitting the distribution of the same information by others. 564 U.S. at 2663, 2671-72. The Supreme Court concluded that heightened judicial scrutiny was warranted there because the statute regulated speech because of disagreement with the message it conveyed—it disfavored speech with a particular content (doctors' prescribing habits) as well as by specific speakers (pharmaceutical marketing companies). *Id.* at 2663-64. The Court noted, however, that the "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* at 2664.

As the district court explained, this case is not like *Sorrell* because the tour guide licensing scheme is not based on the content of any speech and does not

39

discriminate on the basis of viewpoint. JA 198. The regulations apply to *all* persons who act as paid tour guides regardless of the content of their speech. JA 198. "While the District's tour guide licensing scheme will fall disproportionately on individuals wishing to act as tour guides for hire, it is not because of the content of what they say, but because of what they do." JA 198. When "a law prohibits certain conduct, the incidental burdens on speech will *always* fall disproportionately on those individuals who wish to engage in the restricted conduct." JA 198-99 (citing *Christian Legal Soc'y Chapter v. Martinez*, 130 S. Ct. 2971, 2994 (2010) (a regulation that "serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others")). As such, unlike in *Sorrell*, the regulations here are content neutral and subject to only intermediate scrutiny.

The plaintiffs also misplace reliance on *Holder v. Humanitarian Law Project*, 561 U.S. 1, 130 S. Ct. 2705 (2010). Br. 17-18, 24. *Holder* recognizes the undisputed general rule that, when a government regulation is not related to expression but is directed at conduct, then the less-stringent standard of intermediate scrutiny applies. 130 S. Ct. at 2723. *Holder* also recognizes that if "as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message," then the court must apply "a more demanding standard." *Id.* at 2724. The plaintiffs here cite this language and argue that the

40

tour guide licensing scheme is triggered by their conduct communicating a message, Br. 17-18, but they are incorrect.

In *Holder*, the Court rejected a First Amendment challenge to a federal criminal ban on providing material support to terrorist organizations, even though the plaintiffs claimed that their particular, individualized support of a terrorist group was not promoting terrorism, but rather was intended to train members of the group to peacefully resolve disputes and to petition bodies such as the United Nations for relief. 130 S. Ct. at 2729. The Court rejected this argument because it was Congress's prerogative to determine that even this kind of support or speech could promote the group's terrorist goals, especially if it involved helping the groups raise money. *Id.*

Here, the plaintiffs do not identify any individualized message they wish to communicate or otherwise distinguish their situation from that of all other persons subject to general application of the statute. Br. 18-24. Unlike in *Holder*, as applied to the plaintiffs the trigger for application of regulation is conduct, not speech (even if there is an incidental effect on speech). And unlike in *Holder*, this case involves licensing of a profession. Thus, the plaintiffs here are not "in a position parallel to the *Holder* plaintiff," Br. 24, beyond that the Court should reject their claim just as the Supreme Court rejected the *Holder* plaintiff's claim.

\*   \*   \*

41

For these reasons, the district court properly concluded that the licensing scheme is not subject to strict scrutiny.

## II. The District Court Properly Held, Based On The Record, That The Overall Licensing Requirement Satisfies Intermediate Scrutiny.

### A. The overall licensing requirement satisfies intermediate scrutiny.

This Court should affirm the district court's conclusion that the law was valid under intermediate scrutiny. JA 199-205. Applying the standard from *United States v. O'Brien*, 391 U.S. at 377, the court reasonably concluded that the licensing scheme is constitutional because (1) the District has a substantial regulatory interest in using licensing to protect the tourism industry from unscrupulous businesses, JA 199-201; (2) the District's interests are unrelated to the suppression of free speech because they serve a "basic consumer protection function" by ensuring that prospective guides are knowledgeable, trustworthy, and have "at least a minimal grasp of the history and geography" of the District, JA 203; and (3) the burden on speech is incidental and no greater than necessary, JA 203-04. On this latter point, the court properly concluded that, although some questions on the licensing exam might be "odd, obscure, or picayune," the vast majority of questions were consistent with the District's stated interest in ensuring the basic competence of those conducting tours for pay. JA 204. Further, the plaintiffs had provided no evidence that any of their employees have had difficulty obtaining a license when they attempted to do so. JA 204.

42

The plaintiffs do not challenge the district court's logic and conclusions in this regard, except to argue that those conclusions are not based on evidence of record.[5]

### B.    The court had ample justification for its holding.

There was ample justification for the licensing regulations, given the importance of tourism in the District, and the compelling interest that the District has in regulating professions and trades within its border.  This is because, under relevant Supreme Court precedent, the District can meet its burden of justifying a regulatory scheme by reference to newspaper articles, history, consensus, and common sense.

The Supreme Court "has permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.' " *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555-56 (2001) (quoting *Florida Bar*, 515 U.S. at 628).  The Supreme

---

[5]    The plaintiffs note that the test for time, place, and manner restrictions is sometimes phrased differently from in *O'Brien*, cited by the trial court.  Br. 41 n.15; *see Boardley*, 615 F.3d at 516 (citing *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)).  But plaintiffs do not note any substantive difference in the tests, or argue that the district court applied the wrong standard if the regulations are not subject to strict scrutiny, or that the result would be different under a different characterization of intermediate scrutiny.  Br. 41 n.15 (citing *Holder*, 130 S. Ct at 2723 (referring to the *O'Brien* test as "what we have since called intermediate scrutiny")).

Court has also "found 'various unprovable assumptions' sufficient to support the constitutionality of state and federal laws." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 15-16 (D.C. Cir. 2009) (citing *Turner Broad. Sys.*, 520 U.S. at 195, and *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61 (1973)). In *Taylor*, this Court upheld a lobbying disclosure statute though not supported by "studies, statistics, or empirical evidence." 582 F.3d at 15. The Court noted that although limited, the legislative record there was "no less substantial than the record the Court regarded as sufficient in" *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391-94 (2000), "which consisted principally of newspaper accounts and the affidavit" of a state senator. *Id.*

"The fact that a [legislative] directive reflects unprovable assumptions about what is good for the people, including imponderable aesthetic assumptions, is not a sufficient reason to find that statute unconstitutional." *Paris Adult Theatre*, 413 U.S. 49, 61 (1973). This Court has recognized that "when trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support *or at least sound reasoning* on behalf of its measures." *Time Warner Entm't*, 93 F.3d at 976 (emphasis added) (upholding statutory provision against First Amendment challenge even though "Congress made no specific findings in support of [the provision]"). In contrast, compare *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993), where the government

44

failed to meet its burden because the Supreme Court found that the city's ban on commercial newsracks bore "no relationship *whatsoever*" to its asserted interests in safety and aesthetics because noncommercial newsracks vastly outnumbered commercial ones and it was undisputed that both were "equally unattractive." *Id.* at 417-18, 424-26.

It is undisputed that, with its dense concentration of historic, cultural, and political attractions, the District is a popular destination for tourists. It was undisputed below that the District is the third-most popular tourist destination in the United States and attracts approximately 15 million visitors each year. Further, travel and tourism supports more than 66,000 full-time jobs in the District. JA 95; RD 9 at 33. The district court's decision necessarily built on this data, cited in its decision denying a preliminary injunction. JA 95.

History, consensus, and common sense provide the sound reasoning supporting the conclusion that those millions of visitors, as well as the District's residents, are entitled to minimal competence standards for tour guides. The plaintiffs have not presented any reason to doubt the District's asserted justifications for tour guide licensure. *See Nixon*, 528 U.S. at 394 (noting that there might have been a "need for a more extensive evidentiary documentation if [the challengers] had made a showing of their own to cast doubt on" the implications of the opponent's evidence and the record).

45

There is ample justification for the district court's finding that the regulations serve the District's interest in protecting tourists and promoting tourism. The Washington Post editorial reflects that, almost a century ago, there was concern about unlicensed guides intimidating and annoying visitors to the District. *Guides in Washington*, Wash. Post, Aug. 27, 1927, at 6. Within a few years, Congress enacted the licensing statute at issue here. That statute has remained in place for nearly a century without question.

Further, laws, legislative policy statements, and case law from other cities with heavy tourist trades reflect that history, consensus, and common sense justify protecting the District's tourists from unscrupulous, unlicensed guides. As set forth above, many other cities with heavy tourist trades, like New York, Charleston, Savannah, and Philadelphia, have concluded that licensing tour guides is warranted to promote the tourism industry and protect consumers. As Charleston noted in its statute, tour guides need to be licensed in order to "maintain, protect and promote the tourism industry and economy of the city." Charleston, S.C., Code of Ordinance §§ 29-1, 29-58. The federal government similarly licenses guides in national military parks. 36 C.F.R. § 25.2.

Over half a century ago, a New York court concluded that the city had the authority under its police powers to regulate tour guides, because it was a matter of public concern that the health, safety, and morals of the millions of annual visitors

46

to New York not be entrusted to charlatans.  *Bowen*, 11 Misc. 2d at 464-65.  The city had "the responsibility of seeing that strangers" visiting the city were "properly cared for and guided."  *Id.*  The Supreme Court has made plain that local governments generally "have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."  *Florida Bar*, 515 U.S. at 625.  There is no reason to doubt that the concerns in *Bowen* and *Florida Bar* apply here.

These sources reflect a general concern about fraud, shady business practices, and garden variety rip-offs encountered by tourists, and the need to protect tourists and residents from charlatans.  They apply equally to the District and amply support the district court's conclusion that the law passes intermediate scrutiny.[6]

When the Supreme Court rejected the plaintiffs' claim in *Holder* challenging the prohibition on providing material support to terrorist organizations, the Supreme Court noted that, at "bottom, plaintiffs simply disagree with the

---

[6]     At the very least, if the Court finds the evidentiary record insufficient to affirm the district court's judgment, the Court should remand to the district court for further evidentiary proceedings, as in *Heller v. District of Columbia*, 670 F.3d 1244, 1259-1260 (D.C. Cir. 2011).

considered judgment of Congress and the Executive" as to how best to serve the government's interest in preventing terrorism. 130 S. Ct. at 2728. Similarly here, at bottom, the plaintiffs disagree with the considered judgment of the Council and DCRA as to how best to serve the District's interest in promoting and protecting a strong tourism industry in the District. The plaintiffs would, apparently, leave the tour guide business to the free market, unregulated by the legislature. But that judgment call is for the District's elected officials. Their judgment to require tour guides to be licensed does not offend the First Amendment.

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Mary L. Wilson
MARY L. WILSON
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
November 2013                         (202) 724-5693

48

## CERTIFICATE OF SERVICE

I certify that on November 15, 2013, electronic copies of this brief were served through the Court's ECF system, to:

Robert J. McNamara
William H. Mellor III
Robert William Gall
Erik Scott Jaffe
Ilya Shapiro
Eugene Volokh

/s/ Mary L. Wilson
MARY L. WILSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 11,543 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point.

/s/ Mary L. Wilson
MARY L. WILSON