RECORD NO. 13-7063(L); 13-7064

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# TONIA EDWARDS; BILL MAIN,

*Plaintiffs – Appellants*,

**v.**

# DISTRICT OF COLUMBIA,

*Defendant – Appellee*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————

## REPLY BRIEF OF APPELLANTS

————————

*Robert J. McNamara
William H. Mellor, III
Robert W. Gall
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

*Counsel for Appellants*

# AMENDED CERTIFICATE AS TO
# PARTIES, RULINGS, AND RELATED CASES

A.    *Parties and Amici*.  The parties in the District Court and in this Court are Tonia Edwards and Bill Main (Plaintiffs below; Appellants here) and the District of Columbia (Defendant below; Appellee here).  The Cato Institute has filed an *amicus curiae* brief in support of Appellants.

B.    *Rulings under review*.  The rulings under review are (1) the February 14, 2011, Order of the District Court (Judge Paul L. Friedman) denying the plaintiffs' motion for a preliminary injunction, as well as the accompanying memorandum opinion of the same date, and (2) the March 28, 2013, Order of the District Court (Judge Paul L. Friedman) granting the defendant's motion for summary judgment, as well as the related memorandum opinion dated May 7, 2013.

C.    *Related Cases*.  To the best of their knowledge, counsel for Plaintiffs/Appellants are not aware of any previous or pending related cases in this Court.

# TABLE OF CONTENTS

**Page**

AMENDED CERTIFICATE AS TO
PARTIES, RULINGS, AND RELATED CASES ..................................................i

TABLE OF CONTENTS .................................................................... ii

TABLE OF AUTHORITIES................................................................ v

INTRODUCTION ............................................................................1

STATUTES AND REGULATIONS........................................................1

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT....................................................................................2

    I.    THE TOUR-GUIDE REGULATIONS IMPOSE A
        CONTENT-BASED RESTRICTION ON SPEECH. .......................2

        A.    The District's Brief Ignores How Its Regulations
            Actually Work. ........................................................3

            1.    The District ignores record testimony. .......................3

            2.    The tour-guide regulations make no sense as a
                restriction on the conduct of "escorting." .................5

        B.    The District's Argument Conflicts with Binding
            Precedent. ...............................................................7

            1.    Governments do not have carte blanche to
                regulate "content-based categories of
                persons."..........................................................9

i.      There is no freestanding exception to the
        First Amendment for laws that target
        "content-defined categories of persons."........9

ii.     Governments may not reduce the total
        amount of speech in the name of
        regulating the "secondary effects" of
        that speech. ........................................................13

2.  Restrictions on speech are not spared First
    Amendment scrutiny simply because the
    *audience* is engaged in "conduct." ...........................15

3.  *Holder* dictates the standard of review in this
    case. ................................................................................16

4.  The First Amendment applies even when the
    government purports to be licensing a
    profession. ....................................................................17

II.   APPELLANTS HAVE STANDING. ..............................................21

A.  The Tour-Bus Regulations Illustrate that the Overall
    Regulations Are Content-Based. ..........................................21

B.  Main and Edwards Have Standing to Challenge
    Regulations that Forbid Them from Talking to Their
    Customers.................................................................................24

1.  Main and Edwards have standing to challenge
    Section 1200.1 because it prohibits them from
    describing things to their customers even
    when a licensed tour guide is "escorting"
    those customers............................................................24

2.  The Court should disregard the District's
    "severability" argument. .............................................26

III.  THE DISTRICT HAS FAILED TO IDENTIFY EVIDENCE
      JUSTIFYING THE SPECIFIC BURDENS IT IMPOSES ON
      SPEECH. ........................................................................................27

      A.   This Case Is Not a Challenge to All Regulations of
           Tour Guides. ...........................................................................28

      B.   The District's Evidence at Most Justifies *Some*
           Regulation of Tour Guides, Not *These* Regulations
           of Tour Guides.......................................................................29

CONCLUSION ...............................................................................................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Library Ass'n v. Reno,*
    33 F.3d 78 (D.C. Cir. 1994) ..........................................................11

*Boardley v. U.S. Dep't of Interior,*
    615 F.3d 508 (D.C. Cir. 2010) ......................................................30

*Cent. Hudson Gas & Elec. Corp v. Public Serv. Comm'n,*
    447 U.S. 557 (1980) .....................................................................19

*\*City of Erie v. Pap's A.M.,*
    529 U.S. 277 (2000) ...............................................................10, 11

*City of Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988) .....................................................................14

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) .....................................................................13

*Entm't Prods., Inc. v. Shelby Cnty.,*
    721 F.3d 729 (6th Cir. July 9, 2013) ............................................13

*Espresso, Inc. v. District of Columbia,*
    884 F. Supp. 7 (D.D.C. 1995) ......................................................27

*Glickman v. Wileman Bros. & Elliott, Inc.,*
    521 U.S. 457 (1997) .......................................................................5

*\*Holder v. Humanitarian Law Project,*
    130 S. Ct. 2705 (2010) ....................................3, 7, 8, 15, 16, 17

*\*Chief Authorities are Designated by an Asterisk*

v

*Humanitarian Law Project v. Reno*,
　　9 F. Supp. 2d 1205 (C.D. Cal. 1998)...........................................................17

*Hutchins v. District of Columbia*,
　　188 F.3d 531 (D.C. Cir. 1999) .....................................................................29

*Jim Gall Auctioneers, Inc. v. City of Coral Gables*,
　　210 F.3d 1331 (11th Cir. 2000).....................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983) ............................................................................................5

*Nat'l Ass'n of Manufacturers v. Taylor*,
　　582 F.3d 1 (D.C. Cir. 2009) ............................................................32, 33, 34

*People v. Bowen*,
　　11 Misc. 2d 462 (N.Y. Spec. Sess. 1958) .....................................................32

*Renton v. Playtime Theatres*,
　　475 U.S. 41 (1986) ...........................................................................10, 11, 14

*\*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
　　487 U.S. 781 (1988) .......................................................................................18

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
　　502 U.S. 105 (1991) .......................................................................................14

*Tait v. City of Philadelphia*,
　　639 F. Supp. 2d 582 (3d Cir. 2009) ..............................................................31

*Thompson v. W. States Med. Ctr.*,
　　535 U.S. 357 (2002) .......................................................................................19

*Turner Broad. Sys. v. FCC*,
　　520 U.S. 180 (1997) .......................................................................................34

*United States v. Stevens*,
  559 U.S. 460 (2010) ..................................................................18

*United States v. Virginia*,
  518 U.S. 515 (1996) ....................................................................5

*Young v. Am. Mini Theatres, Inc.*,
  427 U.S. 50 (1976) ........................................................10, 11, 14

## CONSTITUTIONAL PROVISION

U.S. Const. amend. I............................................................. 1, 2, 5, 9, 14, 15, 17,
  18, 20, 21, 27, 29

## STATUTES

6 Savannah Code § 6-1502....................................................................31

29 Charleston Code § 29-58..................................................................31

30 New Orleans Code, Ch. XXI, § 30-1486 ..........................................31

N.Y. Admin. § 20-242...........................................................................31

Williamsburg Code § 9-331....................................................................31

## RULE

Fed. R. Civ. P. 30(b)(6) ...............................................................3, 24, 25

## REGULATIONS

D.C. Mun. Regs tit. 19, § 1200.1....................................................22, 26

D.C. Mun. Regs. tit. 19, § 1204.3..............................................24, 25, 26

## INTRODUCTION

In their opening brief, Appellants Bill Main and Tonia Edwards demonstrated that the District of Columbia's tour-guide regulations violate the First Amendment because they are both content-based and speaker-based.  Because the District has failed to counter—and, in some cases, to address—these arguments, the district court's order should be reversed and this case should be remanded with instructions to grant summary judgment to the plaintiffs.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Opening Brief.

## SUMMARY OF ARGUMENT

As demonstrated in Appellants' opening brief, the District's tour-guide regulations impose a content- and speaker-based burden on protected speech in a traditional public forum.  While the District's opposition brief attempts to characterize the regulations as aimed solely at conduct, this characterization requires the District to entirely ignore record evidence and rely on strained analogies to pornographic theaters and

medical doctors.  In the alternative, the District, again ignoring on-point record testimony, argues that the Appellants lack standing to challenge certain aspects of the regulations.  Finally, the District's brief fails to point to evidence that would allow this Court to uphold the tour-guide regulations under any First Amendment standard of review.  For all of these reasons, the judgment of the district court must be reversed.

## ARGUMENT

## I.     THE TOUR-GUIDE REGULATIONS IMPOSE A CONTENT-BASED RESTRICTION ON SPEECH.

The tour-guide regulations forbid certain people from saying certain things in a public forum without first passing a subject-matter examination on the topics about which they want to talk.  That is a content- and speaker-based restriction on speech, and it is subject to strict scrutiny under the First Amendment.

In an effort to avoid this conclusion, the District attempts to paint its regulations as restrictions solely on conduct, not speech.  But in making this argument, the District ignores evidence (including its own deposition testimony) demonstrating that its regulations target speech rather than

2

conduct.  Moreover, it fails entirely to distinguish *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), which controls this case.

### A.    The District's Brief Ignores How Its Regulations Actually Work.

The District goes to great lengths to justify its tour-guide regulations as regulations on the "conduct" of escorting people around the city, but this argument runs afoul of two independent problems:  First, the District completely disregards its own record testimony about the purpose and function of the regulations.  Second, the regulations themselves would make no sense if they were only a restriction on "escorting."

### 1.    The District ignores record testimony.

Common sense suggests that the only reason to make people take a history test before they talk about history is to ensure that they're capable of saying the right things about history.  And, indeed, that is exactly how District of Columbia officials think the city's tour-guide regulations work.  Asked who was required to hold a tour-guide license in the city, the District's 30(b)(6) deponent was unequivocal:  "Persons that are able to communicate with others regarding sights, dates, places, times, things of that nature of the District of Columbia, historical sights."  JA 152.

This admission was not a slip of the tongue. Indeed, the District's own testimony further confirms that the regulations are about speech rather than physical escorting. For example, the District testified that, even if a tour is *physically led* by a licensed guide, every person who *speaks* to the people in the tour group about points of interest in the city must hold a tour-guide license. JA 153 (confirming that "regardless of who is leading a tour, if [anyone is] providing information on these particular topics, [they] need a license"); *see also* JA 156 ("Q: Okay. So if there's a tour that is both led by a licensed sightseeing guide and features commentary during the tour from an unlicensed individual who's describing, explaining or lecturing about the sights in Washington, D.C., that tour is operating in violation of the law. A: You're correct.").

The District consistently testified that the regulations are aimed at guides' speech, not their conduct. *See, e.g.*, JA 151 (agreeing that "the licensing requirement is triggered by someone being able to answer questions . . . on particular topics"). Nothing in the District's brief grapples with this consistent testimony about the speech-related concerns behind the tour-guide regulations. And, outside of the arguments of counsel, there is no testimony in the record indicating any concern with physical conduct

4

at all. Appellants respectfully suggest that in a First Amendment challenge, this Court is entitled to place more weight on the testimony of the people responsible for enforcing these regulations than on the characterizations of appellate counsel. *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (noting that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) (noting that in heightened scrutiny cases, the government's "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation").

### 2. The tour-guide regulations make no sense as a restriction on the conduct of "escorting."

Even if the record were silent on the motivations and operation of the tour guide regulations, the District's argument is irreconcilable with the practical operation of the regulations themselves. The tour-guide regulations make perfect sense if they are meant to regulate speech about the city; they make no sense at all if they are meant to regulate escorting people around the city. *See, e.g., Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 493 (1997) ("For the arbitrariness or underinclusiveness of the scheme chosen by the government may well suggest that the asserted

interests either are not pressing or are not the real objects animating the restriction on speech." (citations omitted)).

The problems with the District's characterization of the regulations as focused on "escorting" are legion.  If the regulations were truly focused on "escorting" rather than communicating, they would require a test on escorting instead of a test on history.  If the regulations were truly focused on "escorting" rather than communicating, they would not impose requirements related solely to communication, like requiring that all guides be fluent in English.

Moreover, if the regulations were truly focused on "escorting," they would only require all groups to be escorted by a licensed guide.  And the regulations do not accomplish even this:  As previously explained, if understood as restrictions on "escorting," the regulations are both overinclusive and underinclusive.  They are overinclusive because they forbid an unlicensed person from lecturing to a tour group, even if that group is also being escorted by a fully licensed guide.  *See supra* at 4.  And they are underinclusive because innumerable people escort customers around town without being forced to take a history test.   Opening Br. at 20. The District again does not dispute this fact; it simply ignores it.

6

\*     \*     \*

The District's argument cannot be squared with either record testimony or the actual operation of the tour-guide regulations, and the District's brief does not even attempt to address these problems (which were squarely raised in Appellants' opening brief at 6-7 and 21-22).

Simply put, the District's tour-guide regulations look like a content-based restriction on speech, they operate like a content-based restriction on speech, and everyone in charge of enforcing them describes them as if they are a content-based restriction on speech.  The only explanation for all of these things is the obvious one:  The tour-guide regulations are a content-based restriction on speech.

## B.    The District's Argument Conflicts with Binding Precedent.

As Appellants discussed at length in their opening brief, this case is controlled by *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010).  Opening Br. at 24-26.  As explained in that brief, the penalties for violating the tour-guide regulations, like the penalties of the law challenged in *Holder*, are triggered by speech.  Appellants are free to rent Segways to people (provided they comply with the relevant business regulations), and they are free to follow their customers around providing advice on how to

7

safely ride Segways.  But if they provide information about points of interest in the District of Columbia (if they say, for example, "This is my favorite building in the city"), they can be criminally punished for doing so without a license.  That is a penalty triggered by speech, which is subject to strict scrutiny.

In an attempt to avoid the strict scrutiny required by *Holder*, the District makes four separate flawed arguments.  It first argues that governments have a free hand to impose regulations on what the District calls "content-based categor[ies] of person" without triggering strict scrutiny.  Br. in Opp. at 17; 30.  Second, it argues that the tour-guide regulations are actually triggered by "conduct" because they only apply when someone is speaking to an audience of people who are being "guided or directed around town."  *Id.* at 18.  Third, it erroneously attempts to distinguish *Holder* by focusing on the Supreme Court's *application* of strict scrutiny in that case instead of focusing on the relevant holding:  that strict scrutiny applies in the first place.  *Id.* at 41.  Finally, in a single sentence, the District asserts that *Holder* does not apply because "this case involves licensing of a profession."  *Id.*  Each of these arguments misunderstands binding Supreme Court caselaw.

8

### 1. Governments do not have carte blanche to regulate "content-based categories of persons."

The District argues that the tour-guide regulations are not a content-based restriction on speech but are only a special burden imposed on a "content-based category of persons."  Br. in Opp. at 17.  This argument is mistaken for two reasons.  First, it is simply not the case that the Supreme Court allows the regulation of "content-based categories of persons" without strict scrutiny.  Rather, the Supreme Court has upheld restrictions of some businesses (primarily pornographic or erotic businesses) because of the demonstrated secondary effects of the business's speech.  The District presents no evidence of "secondary effects" here.  But even if it had, its argument would still run afoul of a second fatal flaw:  The Supreme Court has held that governments may not reduce the *quantity* of speech under the guise of regulating the *secondary effects* of that speech.

### i. There is no freestanding exception to the First Amendment for laws that target "content-defined categories of persons."

The District argues that governments are free to impose special burdens on a "content-based category of persons," so long as government does not attempt to dictate the precise content of anyone's speech.  (Br. in

9

Opp. at 18; 31-32.)  This is incorrect.  The cases the District cites for this idea simply hold that the government can impose burdens on certain speakers when those burdens are only motivated by concerns about "*secondary effects* of such [speakers] on the surrounding community."  *See Renton v. Playtime Theatres*, 475 U.S. 41, 47 (1986); *see also Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976).

The cases cited by the District do not stand for the proposition that restrictions on "content-based category[ies] of persons" are perfectly acceptable.  They stand for the proposition that these restrictions are permissible if (and only if) they do not "attempt to regulate the primary effects of the expression, *i.e.*, the effect on the audience . . . but rather the secondary effects" on third parties.  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 291 (2000) (O'Connor, J., plurality).  In other words, government can regulate (for example) pornographic theaters because those theaters correlate with a rise in crime that harms third parties, but it cannot regulate pornographic theaters because of the effect pornographic movies have on their audience.

This distinction is fatal to the District's argument because the District does not identify any "secondary effects" of tour guides' speech on third

10

parties.[1]  It provides no reason to believe that, for example, a proliferation of tour guides who have not passed a multiple-choice test "causes the area to deteriorate and become a focus of crime," which were the "secondary effects" that justified the regulation in *American Mini Theatres*.  427 U.S. at 71 n.34 (plurality opinion).

Instead, the District's justifications focus on the *primary effects* of tour guides' speech on their audience.  It argues that the District of Columbia is a major tourist destination, that tour guides entertain these tourists for money, and that the District wants to "protect that consumer experience." Br. in Opp. at 18.  Even if one assumes that tour guides who have passed a multiple-choice history test are more entertaining than guides who have not, however, concerns that an audience will be dissatisfied are precisely the sort of primary effects that Justice O'Connor distinguished in *City of Erie.*  Concerns that audiences will have a bad experience while listening to a tour guide—even if that means the audiences stop coming to town and generating tourist revenue—are simply not "secondary" to speech.  They

---

[1] Indeed, despite the fact that the District relies heavily on secondary-effects cases like *Renton* and *American Library Association v. Reno*, 33 F.3d 78 (D.C. Cir. 1994), *see* Br. in Opp. at 30, its brief does not so much as mention the phrase "secondary effects."

are directly caused by speech.  And none of the Supreme Court's "secondary effects" cases has ever upheld a content-based law that was designed to improve the "consumer experience" of people who go to see adult films or erotic dancers.

The District's proposed rule—which would allow municipalities to regulate the quality of speech that affects its tourism industry—would destroy the default rule against content-based restrictions on speech.  To be sure, the District of Columbia has a number of historical attractions that draw tourists to the area.  But it is beyond question that the District of Columbia has other attractions—theatrical productions, opera, ballet, stand-up comedy—that *also* draw tourist traffic.  Nothing in the District's theory of this case would prevent it from regulating the people who provide *those* attractions to ensure that they "are who they say they are" (Br. in Opp. at 15): talented actors, singers, dancers, or joke-tellers.  This Court should therefore reject the District's invitation to radically expand the "secondary effects" doctrine.

12

### ii. Governments may not reduce the total amount of speech in the name of regulating the "secondary effects" of that speech.

Even if the District could identify harmful secondary effects of speech by untested tour guides, its proposed remedy—silencing untested guides entirely—would be impermissible. Even when government regulates speech to diminish harmful secondary effects associated with the speech's content, it must "leave the quantity and accessibility of the speech substantially undiminished." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring in judgment); *see also Entm't Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 735 (6th Cir. July 9, 2013) (noting that this principle binds lower courts because "Justice Kennedy made his concurrence with the plurality [in *Alameda Books*] contingent upon this requirement" (citation omitted)), *petition for certiorari filed* October 4, 2013. That is, while government may impose some burdens on speech in the name of combating its secondary effects, such as forbidding adult theaters in certain parts of town, it may not do so in a way that silences anyone or reduces the total amount of available speech.

Indeed, as first articulated by Justice Powell (and subsequently adopted by a majority of the Supreme Court), the entire justification for the

"secondary effects" doctrine is that government is not trying to silence anyone.  *See Renton*, 475 U.S. at 48 (quoting *Am. Mini Theatres*, 427 U.S. at 82, n.4 (Powell, J.) ("[if] [the city] had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location.")).  Accordingly, governments may not use the "secondary effects" doctrine to defend regulations that act to prevent particular people from speaking.

Yet that is exactly what the tour-guide regulations do.  Licensed guides are allowed to say anything they want, but people without a license are not allowed to speak to particular audiences (paying customers) on particular topics ("points of interest" in the city) on pain of criminal punishment.[2]   Opening Br. at 34-35.  The District's concern that these paying customers might end up misinformed, insufficiently amused, or

---

[2] It is of no constitutional significance that the regulations only prohibit talking to paying customers.  The Supreme Court has consistently treated prohibitions on receiving payment for speech as prohibitions on speech itself.  *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (holding that a restriction on profits from speech about crime was a content-based restriction on speech); *accord City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 n.5 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away.")

14

otherwise unhappy may well be sincere.  But it is not a concern that

permits the District to dictate who may or may not speak.

> ## 2.    Restrictions on speech are not spared First Amendment scrutiny simply because the *audience* is engaged in "conduct."

It is true (but irrelevant) that the penalties in the tour guide

regulations are only triggered if the Appellants speak to a tour group.  Br.

in Opp. at 18.  Main and Edwards are free to rent a concert hall and give a

lecture about places of interest in the city; they are only forbidden from

saying those same things to a group of paying customers on the sidewalk.

But the District cites no case holding that government may prohibit speech

based on its content provided the *audience* is engaged in certain conduct.

Indeed, the groups that the *Holder* plaintiffs wanted to talk to—designated

terrorist groups—were themselves clearly engaged in the *conduct* of

terrorism, but no member of the Supreme Court suggested that this

allowed the government to regulate the plaintiffs' ability to *speak to* these

groups without surviving First Amendment scrutiny.  This argument,

unsupported by any case, should therefore be rejected.

### 3.    *Holder* **dictates the standard of review in this case.**

The District's brief attempt to explain *Holder*, Br. in Opp. at 41, simply fails to focus on the controlling holding of that opinion.  Specifically, the District confuses the Supreme Court's holding about the *level of scrutiny* that applied to the law in *Holder* (strict scrutiny) with the Supreme Court's application of that scrutiny (under which it upheld the law).

In *Holder*, the Supreme Court held that the statute triggered strict scrutiny because it imposed criminal penalties depending on whether the plaintiffs said one thing (like providing expert advice, which was banned) or another (like providing non-expert advice, which was allowed).  130 S. Ct. at 2723-24.  This is the holding that controls here because the tour-guide regulations also impose criminal penalties depending on whether Main and Edwards say one thing ("This is an ugly building," which is banned) or another ("Don't ride your Segway so fast," which is allowed).

But the District, in attempting to distinguish *Holder*, does not even cite this holding.  Br. in Opp. at 41 (citing 130 S. Ct. at 2729 instead of citing 130 S. Ct. at 2723-24).  Instead, it cites a completely different part of the opinion, in which the Court held that (even under strict scrutiny) Congress and the Executive were entitled to forbid the plaintiffs' speech in light of

16

"the real dangers at stake" when dealing with foreign terrorist organizations.  130 S. Ct. at 2729.  Appellants certainly concede that the Supreme Court in *Holder* found that the law ultimately survived strict scrutiny, but this is irrelevant:  The District does not seriously contend that the dangers posed by terrorism are analogous to the dangers posed by Tonia Edwards telling people interesting stories about history.

### 4.    The First Amendment applies even when the government purports to be licensing a profession.

The District's final attempt to distinguish *Holder* is its assertion, without elaboration, that "this case involves the licensing of a profession."  Br. in Opp. at 41.  As an initial matter, this is not even a factual distinction between the cases:  At least some of the *Holder* plaintiffs themselves were licensed professionals—they were attorneys who wanted to give expert legal advice to designated terrorist groups.  *See*, *e.g.*, *Humanitarian Law Project v. Reno*, 9 F. Supp. 2d 1205, 1208-09 (C.D. Cal. 1998) (findings of fact discussing legal assistance offered by the Humanitarian Law Project and its President, Administrative Judge Ralph Fertig).

Moreover, neither the Supreme Court nor this Court has ever held that the mere fact that a law takes the form of "the licensing of a

17

profession" eliminates the need for normal First Amendment analysis. Indeed, to the extent the Supreme Court has addressed the issue, it has said exactly the opposite. *See*, *e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 n.13 (1988) ("Nor are we persuaded by the dissent's assertion that this statute merely licenses a profession, and therefore is subject only to rationality review.").

Since nothing in the caselaw exempts "the licensing of a profession" from First Amendment scrutiny, the District's argument is effectively a request that this Court create a new exception to the First Amendment. But the District's brief presents no basis on which the Court *could* create such an exception—indeed, it does not so much as cite *United States v. Stevens*, 559 U.S. 460 (2010), the Supreme Court's most recent authoritative discussion of when courts can recognize exceptions to normal First Amendment doctrine. *See* Opening Br. at 36-37 (discussing *Stevens*).

Even if this Court were to find a new First Amendment exemption for "professional licensing," such a doctrine would not apply to this case. The District's proposed rule—that it can regulate tour guides without any First Amendment scrutiny just as it can regulate "lawyers, psychiatrists, auctioneers, and salespeople"—is simply incorrect. (Br. in Opp. at 24.)

18

Indeed, it is even incorrect with respect to the specific occupations it lists. "Auctioneers," by definition, offer things for sale and therefore, as other Circuits have recognized, regulations of auctioneers are analyzed as restrictions on *commercial* speech.[3] *See Jim Gall Auctioneers, Inc. v. City of Coral Gables*, 210 F.3d 1331, 1332-33 (11th Cir. 2000) (applying the commercial-speech test of *Central Hudson Gas & Elec. Corp v. Public Serv. Comm'n*, 447 U.S. 557 (1980) to auction regulations). Appellants are unaware of any jurisdiction that regulates "salespeople" as such, but presumably these would also be analyzed as restrictions on commercial speech. *Cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 363 (2002) (analyzing restriction on "promoting, advertising, or *using salespersons*" to solicit business for compound drugs as a commercial-speech restriction (emphasis added)).

The other two occupations offered by the District are also poor analogies. To be sure, every state in the country licenses lawyers; it is illegal to represent clients in court or draft legal documents on their behalf without a license. But there is no jurisdiction that makes it illegal to give

---

[3] The District does not argue that Main and Edwards would be engaging in commercial speech by saying things like "This is the Australian Embassy."

speeches or offer general opinions about the law, even to a paying
audience.  Similarly, psychiatrists are licensed physicians who purport to
treat an individual patient's disease and are authorized to prescribe
pharmaceuticals; no jurisdiction, though, requires a license to talk to a
group of a people about mental health or how best to live one's life.

It is entirely possible that this Court (or the Supreme Court) will
eventually recognize an exception to the First Amendment for the licensing
of those professions, like doctors and lawyers, where the professional
provides individualized advice and makes important life decisions on
behalf of his clients.  But tour guides, who generally offer a particular type
of tour to all customers for the purpose of entertainment, neither make
decisions on behalf of their customers nor purport to cure them of any
disease (except, perhaps, boredom).  Even if this Court were to announce a
new principle exempting certain kinds of professional licensing from any
First Amendment scrutiny, it is difficult to imagine how that principle
would sweep tour guides into its ambit.  *See* Br. of Cato Institute as *Amicus
Curiae* at 11-13.

In short, the District presents no reason for this Court to invent a new
First Amendment doctrine for professional licensing, and this case does not

20

present facts under which any such doctrine would apply if the Court chose to announce one. The Court should therefore decline the District's invitation to create a new exception to the First Amendment and simply decide this case in keeping with the controlling precedents cited by the Appellants.

## II.    APPELLANTS HAVE STANDING.

The District also argues that Appellants lack standing to challenge certain aspects of the tour-guide regulations, either because they do not have standing to challenge the regulation of bus drivers or because this Court should treat individual phrases of the tour-guide regulations as severable and carve out a version of the regulations that does not limit Edwards or Main's speech. These standing arguments—none of which even cite to the district court's well-reasoned standing analysis (*see* JA 190-91) should be rejected.

### A.    The Tour-Bus Regulations Illustrate that the Overall Regulations Are Content-Based.

The District misunderstands the relevance of Appellants' discussion of the District's tour-bus regulations and, accordingly, its argument that Appellants lack standing to challenge these regulations is irrelevant. It is,

of course, true that neither Edwards nor Main gives tours by bus, and so neither is directly affected by section 1204.3 of the regulations, which provides that the driver of a tour bus featuring pre-recorded audio commentary does not need a tour-guide license unless the driver *also* talks to the passengers about points of interest in the city. *Id*. But Edwards and Main do not highlight this section because either one desperately wants to drive a bus; they highlight it because it directly undermines the District's stated justifications for the tour-guide regulations themselves.

The District argues here that the tour-guide regulations are restrictions on *conduct* — that they are a necessary restriction on the act of taking people around the city because taking people around the city creates "a relationship of trust and reliance" in which "[c]ustomers rely on the tour guides to safely take them back to their starting point, and not abandon them in some far-flung spot, or charge them additional amounts to take them back." Br. in Opp. at 38.

The initial problem with this explanation, as explained previously, is that it has nothing to do with forcing would-be guides to pass a multiple-choice history test. But the disconnect between the stated justification and the regulations themselves is made clearest by the regulations' treatment of

22

bus drivers.  If a driver simply drives a bus, he does not require a special tour-guide license (even though a bus driver's passengers clearly "rel[y]" on him more directly than do the participants in a walking tour, who can simply walk away).  If he drives the bus and "talks, lectures, or otherwise provides sightseeing information to passengers," though, he does need a license.  Br. in Opp. at 7.  This distinction makes no sense if the justification for the history test is the fear that a tour guide might abandon his charges in a strange neighborhood.  After all, bus passengers are in exactly the same physical situation whether the driver talks to them or not.  But it makes perfect sense if the justification for the history test is that the District wants to make sure people are qualified to speak about history before they are allowed to do so.

    In short, Appellants do not ask this Court to strike down the tour-guide testing requirements because they want to drive a bus.  They ask this Court to strike down the tour-guide testing requirements because they are a content-based restriction on speech, as illustrated (in part) by the regulations' treatment of bus drivers.

**B.     Main and Edwards Have Standing to Challenge Regulations that Forbid Them from Talking to Their Customers.**

The District also asks this Court to carefully parse section 1200.1 of the tour-guide regulations, severing the second clause of the regulation (which forbids the Appellants from "describ[ing], explain[ing], or lectur[ing]" to their customers) from the first clause (which forbids the Appellants from "guid[ing] or direct[ing]" their customers).  Even if the District were correct that the first clause is constitutional, though, its proposed severability solution accomplishes nothing.  First, the District's own 30(b)(6) testimony clearly establishes that the Appellants are injured by both clauses of section 1200.1.  Second, "severing" some but not all of the words in section 1200.1 would require this Court to either thoroughly rewrite the regulations or create perverse (and clearly unintended) results.

**1.     Main and Edwards have standing to challenge Section 1200.1 because it prohibits them from describing things to their customers even when a licensed tour guide is "escorting" those customers.**

The District argues that the Appellants lack standing to challenge what it calls "the second clause of 19 DCMR [section] 1200.1," the part forbidding them from "describ[ing], explain[ing], or lectur[ing]" because (in the event those words were severed from the rest of the regulations)

24

Appellants would still be subject to regulation under the first clause of the section, which forbids them from "guid[ing] or direct[ing]" their customers.  Br. in Opp. at 33.  The problem with this argument is the same problem that besets the rest of the District's brief:  It completely ignores the binding 30(b)(6) testimony of District officials.

The District's 30(b)(6) designee straightforwardly testified that the regulations would forbid Main and Edwards from lecturing to their customers about points of interest in the city, even if they hired a licensed guide to physically lead the tour group at the same time.  *See* JA 156.  In other words, even if Main and Edwards do not in any way "guide" or "direct" their customers, but simply tell them stories about history, they are still subject to criminal punishment.  The District, once again, does not explain or disavow this testimony but simply ignores it.  Since the "second clause" of section 1200.1 creates an independent injury to both Main and Edwards, they have standing to challenge that clause (along with the rest of the regulations).

### 2.    The Court should disregard the District's "severability" argument.

In any event, the Court should disregard the District's one-sentence assertion that the "second clause" of section 1200.1 is severable from the rest of the regulations. Br. in Opp. at 33. The District does not elaborate on what this severability would look like, but a simple examination of the remaining regulations reveals that it would lead to irrational results that could not have been intended.

Even assuming that the first half of section 1200.1 (which makes it illegal to "guide[ ] or direct[ ]" customers without first passing a history test) would be constitutional standing alone—which it would not—the District's proposed rewriting of the regulations would leave in place section 1204.3, which governs tour buses. This would create the perverse result that anyone could "lecture" to tour groups without passing a history test, unless they were "lectur[ing]" while on a bus, in which case they would be committing a crime. The District does not attempt to justify this result. And if the Court instead chose to sever section 1204.3 along with half of section 1200.1, this would have the effect of imposing a history-test requirement on a group of people (silent bus drivers) that the District chose

26

to exempt from the regulations' requirements. *Cf. Espresso*, *Inc. v. District of Columbia*, 884 F. Supp. 7, 12 (D.D.C. 1995) ("[B]ecause the District included exceptions to the ban in the legislation itself, the Court cannot conclude that an outright ban was the legislative intent.").

Simply put, there is no straightforward way to turn the regulations into a restriction on conduct by severing certain words because the regulations are not (and were not intended to be) a restriction on conduct. They are a restriction on speech.

## III. THE DISTRICT HAS FAILED TO IDENTIFY EVIDENCE JUSTIFYING THE SPECIFIC BURDENS IT IMPOSES ON SPEECH.

As explained in Appellants' opening brief, under any standard of First Amendment scrutiny, this Court requires the government to come forward with evidence justifying the burdens it imposes on speech. Opening Br. at 40-49. The District has failed to do so. At most, it has introduced evidence that might justify some regulation of tour guides (such as limits on guides' solicitation of customers). But this case is not a challenge to all conceivable regulation of tour guides; it is a challenge to the regulations the District has actually adopted, and primarily to its requirement that people take a history test before they are allowed to talk

27

to their customers about history. With respect to *that* requirement, the

District has not come close to identifying sufficient supporting evidence in

the summary-judgment record.

**A.    This Case Is Not a Challenge to All Regulations of Tour Guides.**

This case is only a challenge to the District's existing tour-guide

regulations, which require tour guides to pass a multiple-choice history test

before talking to their customers. Contrary to the District's assertion,

nothing in Appellants argument requires the government to "leave the tour

guide business to the free market, unregulated by the legislature." Br. in

Opp. at 48.[4] There are, of course, any number of content-neutral

regulations the District could impose on the tour-guide industry. And

holding that the District cannot forbid people from talking to paying

customers about history without first passing a history test does not

require this Court to reject any other possible tour-guide regulations.

It is trivial to imagine content-neutral tour guide regulations. *Cf.* Br.

in Opp. at 31 (castigating Appellants for failing to posit a content-neutral

_____

[4] As discussed below, however, as a practical matter, nearly every
jurisdiction does appear to leave the tour-guide business to "the free
market" without any ill effect. *See infra* at 30-32.

definition of "tour guide").  The District could easily regulate the practice of escorting groups of people around town:  It could require that groups be no larger than a certain size, or that people leading these groups refrain from using amplified sound after a certain hour.  It could make it illegal to lead groups through certain parts of town, or it could make it illegal to charge groups for an escort unless the total price is posted and paid up front.  What it cannot do, however, is what it has done:  make it illegal to talk about a certain subject in a public forum without first passing a qualifying exam.

> ### B. The District's Evidence at Most Justifies *Some* Regulation of Tour Guides, Not *These* Regulations of Tour Guides.

Under any level of First Amendment scrutiny, the District's burden would be to present evidence justifying the specific burdens it has chosen to impose on people who want to talk about points of interest in the District of Columbia.  *Cf. Hutchins v. District of Columbia*, 188 F.3d 531, 564 (D.C. Cir. 1999) (en banc) (Rogers, J., concurring and dissenting) ("The essence of intermediate scrutiny, as distinct from rational basis review, is that the government must tailor its burden to relatively specific and important ends and justify incidents of the law that exceed or depart from

29

those ends.").  Specifically, then, it must point the Court to evidence supporting its requirement that anyone who wants to address tour groups on particular subjects first pass a multiple-choice history test.

The District does not do this.  Instead, it recites century-old evidence about aggressive solicitation and the need for general business licensing (already discussed in Appellants' opening brief at 43-49).  But problems with solicitation and general business licensing must be addressed by regulations of solicitation and general business licensing, not by regulations of who may speak.

The District also points this Court to the laws of a few other cities that purport to license tour guides, on the theory that this reflects a "consensus" that licensure is both necessary and beneficial.  Br. in Opp. at 46.[5]  The attempt at demonstrating consensus, however, falls far short.

---

[5] The District's brief also notes that the federal government imposes guide-licensing requirements on guides in "federal military parks," but, significantly, it does not argue that these particular parks are public forums like the sidewalks it seeks to regulate here.  *See Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 514-15 (D.C. Cir. 2010) (rejecting the proposition that, because national parks are called "parks," they all automatically qualify as traditional public forums).  Federal regulations are therefore of limited relevance here.

As an initial matter, the District simply makes assertions regarding the laws of other jurisdictions rather than pointing the Court to evidence of how these other jurisdictions actually enforce guide regulations. As a result, its explanation of the laws of other cities is misleading. For example, the District states that "Philadelphia [has] concluded that licensing tour guides is warranted to promote the tourism industry and protect consumers," Br. in Opp. at 46, but it fails to mention that Philadelphia appears to have abandoned any intention of enforcing that law. *See Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 587-88 (3d Cir. 2009). So far as Appellants are aware, Philadelphia's law has never been enforced, and the District's suggestion to the contrary is simply false. The record contains no information regarding which, if any, of the other cities the District lists actually enforce a tour-guide licensing law.[6]

---

[6] While it is the District's burden to justify its law, for the convenience of the Court and in the interest of candor, Appellants note that they have been able to identify exactly six cities in the United States that might impose testing requirements on guides who work in traditional public forums like sidewalks: New York, NY (N.Y. Admin. § 20-242); Charleston, SC (29 Charleston Code § 29-58); Savannah, GA (6 Savannah Code § 6-1502); Williamsburg, VA (Williamsburg Code § 9-331); New Orleans, LA (30 New Orleans Code, Ch. XXI, § 30-1486) and the District itself. As far as Appellants have found after a thorough search, these six stand alone.

Even if the District's assertions about other jurisdictions were completely true, however, they at most establish that its tour-guide regulations are not *unique*, not that there is anything approaching a consensus that tour guides require any regulation, much less that a multiple-choice history test makes guides more entertaining or their customers more satisfied.[7]  If anything, the thin list of other jurisdictions establishes the opposite proposition: that the District's method of regulating tour guides is very nearly unique among American cities. Nearly all other jurisdictions—including major tourist destinations like Boston, Chicago, San Francisco, and others—appear to survive quite well without tour-guide testing requirements.

Perhaps recognizing the paucity of the evidentiary record here, the District places great weight on this Court's decision in *National Association of Manufacturers v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009).  *See* Br. in Opp. at 44. But *Taylor* cannot bear this weight.

---

[7] Similarly, the District's citation to *People v. Bowen*, 11 Misc. 2d 462 (N.Y. Spec. Session 1958) (Br. in Opp. at 47) is unhelpful.  The court in *Bowen*, after some *dicta* about the general power of the city to license occupations, held that a residency requirement for tour guides was unconstitutional.  Its decision is of limited relevance here.

In *Taylor*, this Court upheld the Lobbying Disclosure Act of 1995, which had been passed out of stated concerns that lobbyists were successfully circumventing the disclosure requirements of the 1946 Federal Regulation of Lobbying Act.  582 F.3d at 6.  The government defended the law as a public-information measure, an assertion which the plaintiffs argued could not be accepted in the absence of "studies, statistics, or empirical evidence explaining why [the plaintiffs] should be required to file disclosure statements."  *Id.* at 15.  This court rejected that argument, but it did so with the benefit of far more evidence (and far more history) than the District has presented here.

In *Taylor*, for example, this Court noted that more than fifty years of Supreme Court precedent upheld the "vital national interest" in lobbying disclosure.  *Id.* at 16.  Here, by contrast, no appellate court has ever upheld a testing requirement like the District's.  The lack of judicial endorsement of the government's theory here is unsurprising because, unlike *Taylor* (which addressed lobbyist disclosure, a topic to which both Congress and state legislatures have returned repeatedly) this case involves a law that almost no other jurisdiction in the country has seen fit to pass.

The distinctions do not end there. In *Taylor*, this Court had the benefit of a legislative record and contemporaneous newspaper accounts that explained the precise evil at which the law was aimed—namely, that lobbyists were circumventing the disclosure requirements contained in existing law. *Id.* at 15 & n.9. Here, we have only outdated accounts of behavior (aggressive solicitation) that is wholly unrelated to whether a guide has passed a multiple-choice test. And in *Taylor*, the government's position ultimately rested on a premise—"good government requires greater transparency"—that represented "a value judgment" that was not "susceptible to empirical evidence." *Id.* at 16. But here, the government's core premise—that tour guides who have not passed a history test will result in reduced tourism revenue—is entirely empirical. Indeed, it is exactly the kind of "economic" justification that this Court distinguished in *Taylor* as being "susceptible to empirical evidence." *Id.* (citing *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 199 (1997) (Kennedy, J., plurality opinion)).

The government has provided no record evidence that would allow this Court to assume that tourists are happier or in any way better off because of the District's history-test requirement than they are in the many other cities (like Boston, Chicago, and Philadelphia) where guides speak

without mandatory testing.  For that reason alone, if for no other, the

judgment of the district court must be reversed.

## CONCLUSION

For the foregoing reasons, the district court's order should be

reversed and this case should be remanded with instructions to grant

judgment to the Plaintiffs.

DATE:  December 6, 2013

Respectfully submitted,

/s/Robert J. McNamara
William H. Mellor (DC Bar No. 462072)
Robert W. Gall (DC Bar No. 482476)
Robert J. McNamara (VA Bar No. 73208)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia  22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email:wmellor@ij.org; bgall@ij.org;
rmcnamara@ij.org

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*6,996*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Book Antiqua*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>December 6, 2013</u>          <u>/s/ Robert J. McNamara</u>
                                        *Counsel for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 6th day of December, 2013, I caused this

Reply Brief of Appellants to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing to

the following registered CM/ECF users:

> Irvin B. Nathan
> Attorney General for the District of Columbia
> Todd S. Kim
> Solicitor General
> Loren L. Alikhan
> Deputy Solicitor General
> Mary L. Wilson
> Senior Assistant Attorney General
> OFFICE OF THE ATTORNEY GENERAL
> 441 4th Street, NW
> One Judiciary Square, Sixth Floor
> Washington, DC  20001
> (202) 724-5693
>
> *Counsel for Appellee*

I further certify that on this 6th day of December, 2013, I caused the

required copies of the Reply Brief of Appellants to be hand filed with the

Clerk of the Court and a copy of the Reply Brief of Appellants to be hand

delivered upon Counsel for the Appellee at the above listed address.

/s/ Robert J. McNamara
*Counsel for Appellants*